IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JIMMY MARTINEZ-LOPEZ and ROSA LINDA SORIANO-TORRES, individually and on behalf of all others similarly situated, | ) ) ) ) Civil Action File No. ) 1:24-cv-02676-JPB-CCB |
| Plaintiffs, | ) ) **CLASS ACTION** |
| v. | ) ) |
| GFA ALABAMA INC. and GLOVIS GEORGIA, LLC d/b/a HYUNDAI GLOVIS, | ) ) **JURY TRIAL DEMANDED** ) |
| Defendants. | ) ) |

### PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Jimmy Martinez Lopez ("Plaintiff Martinez") and Rosa Linda Soriano Torres ("Plaintiff Soriano") (collectively, "Plaintiffs"), pursuant to Fed. R. Civ. P. 15(a)(1)(B), file this First Amended Class Action Complaint as a matter of course for damages and equitable relief against GFA Alabama Inc. ("GFA") and Glovis Georgia, LLC d/b/a Hyundai Glovis ("Glovis") (collectively, "Defendants").

1.    Plaintiff Martinez and Plaintiff Soriano bring these class action allegations individually and on behalf of other similarly situated persons.

2.    Plaintiff Soriano also brings an individual civil rights action pursuant to the Pregnancy Discrimination Act ("PDA") under Title VII and the Americans

with Disabilities Act ("ADA"). She bases these claims on Defendants' refusal to provide reasonable accommodations for conditions related to her pregnancy, including assigning available light-duty tasks, and on Defendants' failure to engage in the interactive process to identify accommodations. Instead of providing the required accommodations, Defendants retaliated against her for requesting accommodations, including by firing her.

## I.      Nature of the Case

3.      This case involves fraud, discrimination, breach of contract, racketeering, and wage violations against foreign workers of Mexican ancestry and national origin who were exploited as part of an illegal scheme for cheap labor in Defendants' warehouses. Plaintiffs were induced to move to the United States by GFA with false promises of highly paid skilled engineering jobs.

4.      GFA recruited Plaintiffs and other foreign professionals from Mexico under the "Trade NAFTA" or "TN" visa program and housed them in Georgia so that they could provide labor for GFA and Glovis in the U.S.

5.      All Defendants knew that TN visas would not and could not be granted for the manual labor positions they wanted to fill in warehouses and on automotive assembly lines. Rather, TN visas are available only to professional-level foreign workers with specialized education and experience who will come to the U.S. to work professional-level scientific and technical jobs.

6. Defendants therefore hatched a scheme to recruit highly skilled Mexican engineers and technicians for non-existent professional-level positions that would qualify for the TN visa program.

7. The plan was a bait and switch accomplished by fraud against the foreign workers and the U.S. government: hire the professional-level Mexican engineers and technicians for non-existent engineer and technician jobs; assist the engineers and technicians with securing the TN visas by submitting fraudulent documents to the U.S. government; and when the foreign workers arrive in the United States, switch the job to a manual labor job with lower and discriminatory pay and excessive mandatory work hours.

8. Plaintiffs and other Mexican engineers and technicians were victims of this fraudulent scheme. They relied upon Defendants' misrepresentations, paid money for fraudulently obtained visas, spent money to travel to the U.S. Consulate for interviews, and moved from Mexico to the U.S. for jobs they reasonably believed qualified for the TN visa program and would utilize their specialized education, experience, and skill.

9. Defendants' conduct violated the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-1 et seq. ("Georgia RICO").

10. Not only were Plaintiffs and other similarly situated Mexican engineers defrauded with false promises of jobs that did not exist; once they

started working for Defendants they were also subjected to race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981") and Title VII, 42 U.S.C. § 2000e–2, and deprived of overtime wages required by the FLSA.

11.    Plaintiff Soriano was further discriminated against on the basis of her pregnancy and pregnancy-related medical condition in violation, of the PDA, 42 U.S.C. §§ 2000e *et seq.*, and the ADA, 42 U.S.C. § 12101 *et seq.*

## II.    Jurisdiction and Venue

12.    This Court has subject matter jurisdiction over the federal claims in this case pursuant to 28 U.S.C. § 1331.

13.    Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Plaintiffs' state law claims because they are part of the same case or controversy as their federal claims.

14.    The Court has personal jurisdiction over GFA because it resides in and conducts systematic and continuous activity in this district, and because its activity in this district gave rise to Plaintiffs' and other similarly situated workers' causes of action.

15.    The Court has personal jurisdiction over Glovis because it conducts systematic and continuous activity in this district, including by associating with GFA as a Georgia RICO enterprise and committing a pattern of racketeering activity through that enterprise, as alleged below.

16.     Venue is proper in this Court because all Defendants either reside, are found, have agents, or transact their affairs in this District and the ends of justice require that all Defendants be brought before the Court.

III.   **The Parties**

17.     Plaintiffs and putative class members are citizens of Mexico, non-citizens of the United States, and non-white Hispanic/Latino persons of Mexican ancestry and national origin ("Mexican/Latino").

18.     Plaintiffs came to the United States on TN visas to work for GFA and Glovis.

19.     Plaintiff Martinez is a resident of Mexico and worked for GFA.

20.     Plaintiff Soriano is a resident of Mexico and worked for GFA and Glovis.

21.     At all relevant times, each Plaintiff was a party to an employment contract with GFA or with GFA and Glovis, either individually or under a theory of joint employment, within the meaning of 42 U.S.C. § 1981 and the common law.

22.     At all relevant times Plaintiff Martinez was an employee of, and a party to an employment contract with, GFA within the meaning of the FLSA, 29 U.S.C. § 203(e)(1).

23.     Pursuant to 29 U.S.C. § 216(b), Plaintiff Martinez files his Consent to Sue. (Doc. No. 1-1).

24.    At all relevant times, Plaintiff Soriano was an employee of GFA within the meaning of the FLSA, 29 U.S.C. § 203(e)(1).

25.    At all relevant times, Plaintiff Soriano was an employee of Glovis within the meaning of the FLSA, 29 U.S.C. § 203(e)(1).

26.    Pursuant to 29 U.S.C. § 216(b), Plaintiff Soriano files her Consent to Sue. (Doc. 1-2).

27.    GFA is a Georgia limited liability company with its principal place of business at 6211 Fairfax Bypass; Valley, Alabama 36854.

28.    GFA is a logistics company and labor recruiter based in Valley, Alabama with warehouse locations in Alabama and Georgia including at 150 Greenwood Ind. Pkwy.; McDonough, Georgia 30253 ("McDonough Warehouse"), and an office in Mexico City, Mexico. GFA provides material handling services in a warehouse owned or operated by Glovis at 101 Progress Blvd, West Point, Georgia ("West Point Warehouse").

29.    Glovis is a Georgia limited liability company with its principal place of business at 6101 Sorento Rd., West Point, Georgia, 31833.

30.    Glovis is a logistics company and is part of the Hyundai Kia Automotive Group headquartered in Seoul, South Korea. Glovis operates the West Point Warehouse using GFA's materials handling services.

31.    At all relevant times, GFA was an "employer," either individually or under a theory of joint employment, of each Plaintiff and similarly situated Mexican/Latino workers, within the meaning of the FLSA, 29 U.S.C. § 203(d), and of Title VII, 42 U.S.C. §§ 2000e(b).

32.    At all relevant times, Glovis was an "employer," either individually or under a theory of joint employment, of Plaintiff Soriano and similarly situated Mexican/Latino workers, within the meaning of the FLSA, 29 U.S.C. § 203(d), and of Title VII, 42 U.S.C. §§ 2000e(b).

33.    At all relevant times, each Defendant was a "covered entity" within the meaning of the ADA, 42 U.S.C. §§ 12111(2).

34.    At all relevant times, each Defendant was an "employer," either individually or under a theory of joint employment, of Plaintiff Soriano and similarly situated workers, within the meaning of the ADA, 42 U.S.C. §§ 12111(5).

35.    GFA and Glovis are each engaged in commerce or in the production of goods for interstate commerce.

36.    GFA and Glovis each have a gross volume of sales made or business done of not less than $500,000 per year.

37.    Defendants' conduct violated the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-1 et seq. ("Georgia RICO").

38.     At all relevant times, each Plaintiff was an "aggrieved person" with standing to sue within the meaning of the Georgia RICO, O.C.G.A. § 16-14-6(b).

39.     At all relevant times, each Defendant was a "person" within the meaning of the Georgia RICO, O.C.G.A. § 16-14-4.

## IV.   The RICO Enterprises

40.     GFA and Glovis were an enterprise ("RICO Enterprise I") within the meaning of that term as defined by the Georgia RICO in that they were associated in fact although not a legal entity.

41.     GFA and Glovis were associated with RICO Enterprise I.

42.     Non-party Capital People, GFA, and Glovis were an enterprise ("RICO Enterprise II") within the meaning of that term as defined by the Georgia RICO in that they were associated in fact although not a legal entity.

43.     GFA and Glovis were associated with RICO Enterprise II.

44.     RICO Enterprise I and RICO Enterprise II are referred to herein collectively as the "RICO Enterprises."

## V.   Joint Employment Allegations

45.     At all relevant times, GFA and Glovis jointly employed Plaintiff Soriano and other similarly situated Mexican/Latino engineers as non-exempt employees under the FLSA to work at West Point Warehouse.

46.    Glovis contracted with GFA for the performance of work by Plaintiff Soriano and other similarly situated Mexican/Latino workers at the West Point Warehouse.

47.    Glovis exercised substantial control over the conditions of Plaintiff Soriano's and other similarly situated workers' employment at the West Point Warehouse, such that Glovis was a "joint employer" with GFA. With respect to Plaintiff Soriano and other similarly situated workers at the West Point Warehouse, Glovis owned or controlled the premises, the equipment used to perform their work, and the commodities the workers handled as essential functions of their employment.

48.    With respect to Plaintiff Soriano and other similarly situated workers at the West Point Warehouse, Glovis determined the hours they could access West Point Warehouse, set quality control standards, had the power to re-hire and extend contracts and immigration status, established pay rates through its contract with GFA, and determined work assignments, all according to Glovis's business needs.

49.    Plaintiff Soriano and other similarly situated workers at the West Point Warehouse performed labor integral to Glovis's business, namely the production and transportation of automobile parts.

50.     Plaintiff Soriano and other similarly situated workers at the West Point Warehouse exclusively performed labor supporting the production of Glovis products in facilities owned by Glovis and using equipment owned by Glovis.

51.     Glovis controlled the production scheme in its West Point Warehouse.

52.     Glovis closely supervised the work of Plaintiff Soriano and similarly situated workers through both in-person review and intensive digital monitoring, which included a system identified to Plaintiff Soriano as Just In Sequence that was hosted on glovisga.com. Glovis required Plaintiff Soriano and her GFA supervisors to use Glovis-owned and controlled digital systems in the regular course of their work for Glovis. These digital systems dictated Plaintiff Soriano's and similarly situated workers' work assignments and monitored their progress.

53.     Glovis periodically sent Glovis supervisors, who wore Glovis badges, to personally inspect the West Point Warehouse and conduct quality control.

54.     Plaintiff's direct supervisor, GFA employee Jorge Encinas, told Plaintiff Soriano on multiple occasions that GFA shared "all worker information" with Glovis, and Glovis decided whether Plaintiff Soriano and other of GFA's TN-visa workers would be fired or would be allowed to continue working at the West Point Warehouse.

55.     At all relevant times, GFA and Glovis employed Plaintiff Soriano and similarly situated workers at the West Point Warehouse within the meaning of Title VII, the ADA, and the FLSA.

56.     At all relevant times, Plaintiff Soriano and similarly situated workers at the West Point Warehouse were parties to an employment contract with GFA and Glovis, either individually or under a theory of joint employment, within the meaning of 42 U.S.C. § 1981 and the common law.

57.     Glovis knew that many TN visa workers who had been recruited by GFA quit working very soon after starting work at the West Point Warehouse.

58.     Glovis management and supervisors often monitored Plaintiff Soriano's and other TN visa workers' work while walking through the West Point Plant Warehouse with GFA.

59.     Glovis managers knew the reason many TN visa workers quit early was that the work was not consistent with the promises made during their recruitment and required under the TN visa program.

## VI.    Administrative Exhaustion

60.     Plaintiffs Martinez and Soriano exhausted their administrative remedies at the Equal Employment Opportunity Commission.

61.     The U.S. Equal Employment Opportunity Commission ("EEOC") issued Plaintiffs Martinez and Soriano Notices of Right to Sue, which Plaintiff

Martinez and Plaintiff Soriano received on June 11, 2024. True and correct copies of these notifications have been filed with the Court. (Docs. 1-3, 1-4).

62.    Plaintiffs filed a Complaint in this Court within 90 days of Plaintiff Martinez's and Plaintiff Soriano's receipt of the EEOC Notices of Right to Sue. (Doc. 1).

## VII.  Statement of Facts

### A.    The TN Visa Program

63.    The North American Free Trade Agreement ("NAFTA") came into force on January 1, 1994 and created a special trade relationship between the United States, Mexico, and Canada. *See generally*, North American Free Trade Agreement, Can.-Mex.-U.S., Dec. 17, 1992, 32 I.L.M 289 (1993).

64.    The U.S. government created the TN nonimmigrant classification, commonly known as the TN visa, to permit Mexican and Canadian professionals in certain occupations ("TN profession") to temporarily enter the U.S. for employment within their profession. *See* 8 C.F.R. § 214.6(a).

65.    "Engineer" and "Scientific Technician/Technologist" are among the categories of professionals permitted entry into the United States with TN visas. *See* 8 C.F.R. § 216.4(c) (incorporating Appendix 1603.D.1 to Annex 1603 of the NAFTA).

66.    A Mexican citizen applying for a TN visa:

must present documentation sufficient to satisfy the consular officer . . . that the applicant is seeking entry to the United States to engage in business activities for a United States employer(s) or entity(ies) at a professional level, and that the applicant meets the criteria to perform at such a professional level. This documentation may be in the form of a letter from the prospective employer(s) in the United States or from the foreign employer, and must be supported by diplomas, degrees or membership in a professional organization . . . The documentation shall fully affirm:

    a.    The [TN] profession of the applicant . . . ;

    b.    A description of the professional activities, including a brief summary of daily job duties, if appropriate, in which the applicant will engage in for the United States employer/entity;

    c.    The anticipated length of stay;

    d.    The educational qualifications or appropriate credentials which demonstrate that the . . . Mexican citizen has professional level status; and

    e.    The arrangements for remuneration for services to be rendered.

8 C.F.R. § 214.6(d)(3)(ii).

67.    The TN visa applicant "must engage in a prearranged business activity at a professional level for a U.S. or foreign employer." 9 F.A.M. § 402.17-5(A).

68.    Once an applicant has provided the required documentation, the applicant may be admitted under the TN visa classification for a period of up to three years. *See* 8 C.F.R. § 214.6(e).

69.    The TN visa is tied to the associated employer for the duration of the TN visa period unless a new employer submits a verified petition to USCIS

seeking to add or change employers. 8 C.F.R. § 214.6(i)(1) (the new employer must file a Form I-129, Petition for Nonimmigrant Worker).

70.     Since 1997, the number of TN visas issued has increased significantly every year, except for 2020 due to the COVID-19 pandemic. For example, in 1997, 287 TN visas were issued to Mexican nationals.[1] By 2007, the number had increased to 4,060.[2] In 2017, it had grown to 15,993 visas.[3] In 2022, 33,330 TN visas were issued to Mexican nationals.[4]

71.     Government oversight of TN visa holders' working conditions in the United States is limited. As a consequence, there have been multiple reports of

---

[1] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 1998), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY1998_NIV_Detail_Table.pdf (last viewed June 19, 2024).

[2] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2007), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY07NIVDetailTable.pdf (last viewed June 19, 2024).

[3] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2017), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY17NIVDetailTable.pdf (last viewed June 19, 2024).

[4] *See* Nonimmigrant Visas Issuances by Visa Class and Nationality, U.S. Department of State (FY 2022), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY22NIVDetailTable.pdf (last viewed June 19, 2024).

abuses—including misrepresentations in employment contracts—of TN workers,[5] as well as several lawsuits.[6]

**B.    Defendants' Fraudulent Scheme**

72.    The Defendants conducted or participated in RICO Enterprise I and RICO Enterprise II through the acts and omissions set forth in paragraphs 73–90 below, which constituted a pattern of racketeering activity.

73.    Glovis requested that GFA recruit Mexican workers to come to the United States and work for Glovis pursuant to the TN visa program.

74.    Glovis and GFA knew the requirements of the TN visa program, and that the TN visa was not available to workers performing unskilled manual labor.

75.    Glovis's purpose of having GFA recruit Mexican TN visa workers was to secure high-skilled and hard-working workers who would be relatively inexpensive to employ as compared to other workers.

---

[5] Coerced under NAFTA: Abuses of Migrant Workers in the TN Visa Program and Recommendations for Reform, Centro de los Derechos del Migrante (Dec. 2017), https://cdmigrante.org/wp-content/uploads/2018/01/Coerced-under-NAFTA_-Abuses-of-Migrant-Workers-in-TN-Visa-Program.pdf (last viewed June 19, 2024).

[6] *See, e.g., De la Fuente v. Columbia Recycling Corp.*, No. 4:22-CV-00256-WMR, 2023 WL 8712065, -- F.Supp.3d -- (N.D. Ga. Nov. 30, 2023); *Martinez v. Mobis Ala., LLC*, No. 3:22-cv-00145-TCB-RGV, 2024 U.S. Dist. LEXIS 1133 (N.D. Ga. Jan. 2, 2024); *Martinez-Rodriguez v. Giles*, 31 F.4th 1139 (9th Cir. 2022); *Castellanos v. Worldwide Distribution Sys. USA, LLC*, No. 2:14-CV-12609, 2016 WL 11678220, at *8 (E.D. Mich. June 20, 2016).

76.    While employing the TN visa workers at the West Point Warehouse, it was known to Glovis that many workers quit because the jobs they were given were incompatible with the TN visa program and contrary to the promises made during recruitment.

77.    Glovis – as confirmed by GFA supervisor Jorge Encinas – had actual knowledge of "all worker information" relating to Plaintiff Soriano and other TN visa workers.

78.    Glovis knew that GFA was providing TN visa workers through fraudulent recruiting, and Glovis knew that the TN visa workers were not allowed to be placed in low skilled manual labor positions.

79.    Glovis continued to hire GFA and accept employees with this knowledge.

80.    Public job listings show that GFA openly advertised that it was recruiting Mexican engineers to work with TN visas in Georgia automobile warehouses.[7] In those listings, GFA advertised that it was recruiting Mexican engineers to work in Georgia with TN visas in LG product warehouses.

---

[7]    https://mx.trabajosdiarios.com/trabajo/2572281/ingenieros-para-visa-tn-en-ciudad-de-mexico (last visited Oct. 11, 2024).

81.    Glovis committed the acts and omissions set forth herein against the West Point Subclass with the express, implied, and apparent authority of GFA, and Glovis ratified GFA's acts and omissions.

82.    GFA committed the acts and omissions set forth herein against the West Point Subclass with the express, implied, and apparent authority of Glovis, and GFA ratified Glovis's acts and omissions.

83.    Plaintiffs and other class members applied to engineering jobs with GFA in hopes of being able to come to the United States to work legally, expand their professional skills, and earn a better living.

84.    GFA prepared Offer Letters offering Plaintiffs and other class members engineering jobs in the United States.

85.    The Offer Letters contained representations about the terms and conditions of the Plaintiffs' and other class members' employment which GFA knew were false.

86.    Plaintiffs and other class members accepted GFA's job offers in reliance on the misrepresentations in the Offer Letters.

87.    To secure TN visas for Plaintiffs and others Mexican workers so that they could come to the United States to work, GFA prepared TN Visa Support Letters for each. The Support Letters were addressed to the United States

Consulate in Mexico, were on GFA letterhead, and were signed by a GFA corporate representative acting as an agent for GFA.

88.    The Support Letters contained representations about the terms and conditions of the Plaintiffs' and other class members' employment which GFA knew were false.

89.    Plaintiffs and other class members pursued the TN visa, including spending considerable money for visa fees and to travel for consular processing, and to travel to and within the United States to begin their employment, and purchasing home goods once in the United States, in reliance on the misrepresentations in the Support Letters.

90.    The U.S. government issued TN visas to Plaintiffs and other class members in reliance on the misrepresentations in the Offer Letters and Support Letters.

**C.    Plaintiff Martinez**

91.    Plaintiff Martinez trained as an industrial engineer and worked as a professional engineer in Mexico for approximately six years prior to his employment with GFA.

92.    In or around February 2022, Plaintiff Martinez saw an announcement for an engineering job in the United States with GFA on CompuTrabajo, an online job recruitment platform in Mexico. The announcement stated that GFA would

help engineers obtain visas to work as professional engineers in the United States. Plaintiff Martinez clicked on the announcement to indicate that he was interested in the job with GFA.

93.    Following this, a recruiter named Salvador Cortes Galan called Plaintiff Martinez. Mr. Cortes Galan told Plaintiff Martinez that he worked for a recruitment agency called Capital People and was recruiting for a vacancy with GFA.

94.    Capital People routinely recruits prospective TN visa holders from Mexico and facilitates TN visa processing.

95.    Capital People contracted with GFA to achieve the common purpose of securing cheap manual labor to work at GFA's facilities in violation of immigration laws, and to profit from such labor.

96.    Mr. Cortes Galan invited Plaintiff Martinez to immediately interview for a position. Plaintiff Martinez did so.

97.    Mr. Cortes Galan and another man, called David, interviewed Plaintiff Martinez. During the interview, Mr. Cortes Galan asked Plaintiff Martinez about his experience managing people, his prior work responsibilities, and his level of English. Plaintiff Martinez told Mr. Cortes Galan that he had five years of experience managing construction projects, including budgeting, and supervising a team of up to 200 people. He also said he could converse in English.

98.     On or around April 8, 2022, Mr. Cortes Galan sent Plaintiff Martinez an Offer Letter on GFA letterhead for "an employment with TN Visa opportunity." (Doc 1-5).

99.     The Offer Letter specified that Plaintiff Martinez would have "full-time employment" at GFA as an "Industrial Engineer," consistent with Plaintiff Martinez's qualifications as an engineer. *Id.*

100.    Lacey Maxwell, HR Generalist at GFA, signed the Offer Letter. *Id.*

101.    At the time Ms. Maxwell signed the Offer Letter, she knew the representations regarding the role and job duties set forth in the Offer Letter were false.

102.    Plaintiff Martinez accepted the job offer and signed the Offer Letter the same day in reliance on the misrepresentations in the Offer Letter.

103.    At the same time GFA transmitted the job offer, it sent a Support Letter to Plaintiff Martinez. Plaintiff Martinez's Support Letter was on GFA letterhead addressed to "Acting Nonimmigrant Visa Section Chief, American Consulate General," and signed by Lacey Maxwell, HR Generalist at GFA. (Doc. 1-6).

104.    The Support Letter specified Plaintiff Martinez would work as an Industrial Engineer, that this role was "professional and specialized in nature and qualifies as Engineer under Appendix 1603.D.1. to Chapter 16 of the NAFTA. The

requirements for an Engineer, as listed in Appendix 1603.D.1, is a Bachelor or Licenciatura Degree; or state/provincial license." *Id.*

105.    The Support Letter provided a detailed job description for the Industrial Engineer position at GFA and specified Plaintiff Martinez's duties would include the following technical services:

1.  Identify and review transportation network and workflow, work sequencing, and equipment capacity throughout the logistics and supply chain management systems and processes.
2.  Participate in design reviews to ensure deliverability of a specific type of product and optimize the use of resources, such as computer systems, robots, materials, tools, and devices.
3.  Manage resources and maintain schedule requirements to meet required supply and distribution schedules.
4.  Develop efficient ways to utilize machines, materials, and processes for maximum capacity and productivity improvements.
S. Participate in designing and developing quality control systems for consistent performance of top-quality logistics and warehousing systems.
6. Manage, evaluate, and update required equipment and control panels, ensuring efficiency, quality, and procedural compliance.

*Id.*

106.    At the time Ms. Maxwell signed the Support Letter, she knew the role and job duties set forth in the Support Letter were false.

107.    In April and May 2022, another Capital People recruiter, Mr. Constantino, prepared Plaintiff Martinez for his interview with the U.S. Consulate. He told Plaintiff Martinez to show the consular official the GFA Support Letter to support his application for a TN visa.

108.    In reliance on the misrepresentations in the Offer Letter and Support Letter, Plaintiff Martinez spent considerable money for visa fees and to travel for

consular processing, to travel to and within the United States to begin his employment with GFA, and to purchase household goods once in the United States. These expenditures included, but were not limited to, the following:

   a.    Approximately $223 in passport and visa fees;
   b.    Approximately $171 for luggage;
   c.    Approximately $57 for apartment supplies;
   d.    Approximately $100 for safety boots for work;
   e.    Approximately $25 for a reflective vest for work.

109.   On May 24, 2022, in reliance on the misrepresentations in the Offer Letter and Support Letter, the U.S. government issued a TN visa for Plaintiff Martinez to work for GFA Alabama, Inc. as an Engineer.

110.   In or around June 2022, in reliance on the false promises made by GFA concerning the job promised to him in the Offer Letter and Support Letter and his eligibility for that job under U.S. law, Mr. Martinez moved from Mexico to the United States to begin work at the GFA McDonough Warehouse.

111.   Plaintiff Martinez worked for GFA Alabama, Inc. from June 2022 through December 4, 2022.

112.   When Plaintiff Martinez arrived at the GFA McDonough Warehouse in June 2022, he was surprised to discover that GFA required him to do manual labor instead of the professional engineering work it had promised him in both the Offer Letter and the Support Letter. Specifically, GFA supervisors assigned

Plaintiff Martinez to use a packaging machine to package LG appliances in the warehouse.

113.    Plaintiff Martinez objected that he had been hired as an engineer, but GFA refused to assign him engineering duties. At no point did GFA assign Plaintiff Martinez the engineering work that it had promised him, and that it had represented to the U.S. government he would perform.

114.    Plaintiff Martinez regularly worked in excess of 40 hours per work week. For example, from June 27, 2022 to July 1, 2022, he worked for at least 58.5 hours, and from July 10, 2022 to July 16, 2022, he worked for at least 71.5 hours.

115.    Plaintiff Martinez did not receive any documentation concerning Defendants' policies or his job duties, or concerning payment, transportation, employee housing, or other miscellaneous deductions. Plaintiff Martinez was required to use a system called Deputy for timekeeping, which was a mobile application he was required to download to his personal phone. He received pay via direct deposit. He also was required to use a program identified to him as Just in Time to track employee productivity and performance.

116.    Beginning in August 2022, GFA assigned Plaintiff Martinez to load trucks using a forklift, in addition to his packaging work.

117.    In October 2022, GFA began to require Plaintiff Martinez and other workers with TN visas to work as security officers at the McDonough Warehouse.

In this role, Plaintiff Martinez and his coworkers had to work twelve-hour shifts in a security booth, guarding the warehouse, at least once a week and sometimes twice a week. They were also assigned to clean the warehouse, including the toilets.

118.    The packaging, forklift, security, and cleaning work GFA assigned to Mr. Martinez required no technical skill and instead involved repetitive motions, heavy manual labor, and long hours standing up.

119.    Throughout his employment with GFA, Plaintiff Martinez regularly worked eleven-and-a-half hour shifts at night. When Plaintiff Martinez first started at GFA and was assigned to the night shift, Travis Fox, GFA's General Manager, promised that Plaintiff Martinez and other workers with TN visas would only have to work for two months on the night shift before they could start working exclusively on the day shift. However, Plaintiff Martinez was assigned to work the night shift for the entirety of his time at GFA—he never worked the day shift.

120.    Over the course of Plaintiff Martinez's employment, GFA shifted the American and/or non-Mexican/Latino workers on the night shift to the day shift and replaced them with Mexican/Latino workers, until its workforce was fully segregated and only Mexican/Latino workers were required to work the night shift.

121.    On the days when GFA required Plaintiff Martinez and his Mexican/Latino coworkers to clean the warehouse, it allowed the American and non-Latino workers to go home to rest because those workers said they were not willing to clean. Plaintiff Martinez never saw American and non-Latino workers assigned the same cleaning duties.

122.    GFA managers criticized Plaintiff Martinez and his Mexican/Latino coworkers for supposedly being idle or working too slowly, yet Plaintiff Martinez never heard GFA criticize American and non-Latino workers who performed at a slower pace than he did.

123.    GFA managers Jeff Hammond and Travis Fox, who are both white, non-Latino, and U.S. born, harassed and mocked Plaintiff Martinez and other Mexican/Latino workers relating to their English-speaking ability.

124.    GFA manager Jeff Hammond prohibited Plaintiff Martinez and his Mexican/Latino coworkers from speaking Spanish at GFA, saying that they were in the United States and had to speak English.

125.    Mr. Hammond prohibited Plaintiff Martinez and his Mexican/Latino coworkers from speaking Spanish at GFA in part to prevent them from communicating with their Spanish-speaking co-workers regarding their complaints about the illegal and discriminatory wages and working conditions.

126.    Mr. Hammond did not prohibit English-speaking employees from communicating with their coworkers in English.

127.    GFA also required Plaintiff Martinez and his TN visa holder colleagues to live in and pay for employer-procured housing and to pay for the use of employer-owned transportation.

128.    Plaintiff Martinez, like other TN visa holder colleagues, was required to pay $100 per week to GFA for limited use of a company vehicle and a shared bedroom in a crowded apartment.

129.    Plaintiff Martinez often worked overtime hours in excess of 40 hours in a workweek and was not paid overtime at the rate of 1 ½ times his regular rate of pay for the hours in excess of 40 hours in the workweek.

130.    Plaintiff Martinez and the other TN visa workers could not freely use the GFA-provided transportation, which only transported them between the McDonough Warehouse and the employer-provided housing, or on occasional trips to buy groceries.

131.    GFA also forbade Plaintiff Martinez and the other TN visa workers from having visitors at their apartments in part to prevent them from communicating with anyone outside the company about their complaints.

132.    GFA deducted the $100 per week from Plaintiff Martinez's pay. These deductions were not identified or reflected in his paystubs. GFA did not require

American and non-Latino workers to live in employer-procured housing or to use employer-procured vehicles; nor did it charge them for these.

133.    Plaintiff Martinez observed that the amount deposited in his bank account was consistently $100 less than the amount reported on his paystubs.

134.    As a result of these off-the-books $100 weekly deductions, Plaintiff Martinez and the other Mexican/Latino TN visa holders consistently earned an overtime rate of pay that was less than one-and-one-half times their regular rate of pay.

135.    Defendant GFA provided the housing and transportation primarily for the benefit and convenience of GFA.

136.    Plaintiff Martinez's and other similarly situated Mexican/Latino workers' acceptance of the housing and transportation was not voluntary.

137.    Conditions in the housing did not comply with applicable federal, state, or local laws.

138.    On information and belief, Defendant GFA did not maintain accurate records of the cost incurred in furnishing the housing and transportation.

139.    The $100 weekly deduction from Plaintiff Martinez's and other similarly situated workers' wages exceeded the reasonable cost and fair value of the housing and transportation.

140.    Around August 2022, Plaintiff Martinez learned that GFA was paying him and his Mexican/Latino engineer coworkers less than what it paid American and non-Latino workers with no professional qualifications in similar jobs, or jobs with fewer job responsibilities. After deductions, Plaintiff Martinez earned approximately $11 per hour. American and non-Latino coworkers who worked in similar positions to Plaintiff Martinez told him that GFA paid them between $17–18 per hour.

141.    According to Glassdoor.com, Industrial Engineers employed at GFA earn between $79,000 and $123,000 per year.[8] On information and belief, GFA paid these higher wages to non-Hispanic, non-Latino, non-Mexican origin, and/or U.S.-born employees who were hired as Industrial Engineers. The only persons hired as Industrial Engineers who were not employed as engineers were those persons who were Hispanic/Latino or of Mexican national origin. As such Plaintiff Martinez and the other TN visa holders hired as engineers were discriminated against and earned considerably less than American and/or non-Latino, non-Mexican employees with equivalent professional qualifications that GFA hired as engineers.

---

[8]    https://www.glassdoor.com/Salary/GFA-Alabama-Industrial-Engineer-Salaries-E7802633_D_KO12,31.htm (last viewed June 19, 2024).

142.    GFA also required Plaintiff Martinez and his Mexican/Latino coworkers to work long shifts with mandatory excessive overtime hours—often eleven-and-a-half hours a day or more. Working so many hours exhausted Plaintiff Martinez. He experienced headaches, and his eyes hurt when he was in daylight.

143.    GFA did not require Plaintiff Martinez's American and non-Latino coworkers to work so much overtime.

144.    The requirement that Plaintiff Martinez and other Mexican/Latino workers work excessive overtime caused an adverse effect on the terms, conditions, and benefits of Plaintiff Martinez's and other Mexican/Latino workers' employment.

145.    Plaintiff Martinez complained in meetings with GFA's management about the differences between how GFA treated American and non-Latino workers and Mexican/Latino workers. As a result, Plaintiff Martinez suffered further discrimination. On at least five separate occasions, GFA management told Plaintiff Martinez and other Mexican/Latino workers that they could go back to Mexico if they did not like their treatment, and that there were plenty of other workers who could take their place. GFA did not make similar statements to American and non-Latino workers in the same or similar roles as Plaintiff Martinez.

146.    In reality, TN visa holders who leave their jobs have multiple legal options to remain in the United States. An automatic grace period allows them to remain in the United States for up to 60 days after the end of their employment. 8 C.F.R. 214.1(l)(2). They can also change to a new TN employer by filing Form I-129 with U.S. Citizenship and Immigration Services. *See* U.S. Department of State Foreign Affairs Manual, 9 F.A.M. 402.17-5(A)(7).

147.    GFA management intentionally omitted the fact that the law did not oblige Plaintiff Martinez and his Mexican/Latino TN colleagues to return to Mexico if they quit their jobs. GFA management threatened them with this false ultimatum—accept discriminatory working conditions or go back to Mexico—in furtherance of the RICO Enterprises and their discriminatory practices.

148.    In June 2022, Plaintiff Martinez and his Mexican/Latino TN visa coworkers who were assigned to the night shift began to complain in daily pre-shift meetings with GFA management, including Mr. Josh Kim, Mr. Travis Fox, and Mr. Jeff Hammond. They complained that they were required to perform manual labor instead of their promised engineering duties, about the lack of clarity in how overtime pay was calculated, and that their pay did not match what they had been promised.

149.    Plaintiff Martinez observed that after he raised his June 2022 complaints regarding overtime and other aspects of his job, his work assignments

30

became more numerous and arduous, and he was required to work faster to complete them.

150.    Beginning in or around mid-August 2022, Plaintiff Martinez and his Mexican/Latino TN visa coworkers began to lodge additional complaints in their daily meetings with GFA management. They complained that they had been assigned to the night shift during their whole tenure at GFA while similarly situated American and non-Latino workers were permitted to work the day shift. Plaintiff Martinez and his Mexican/Latino TN visa coworkers complained that they had been promised that they would alternate between night and day shift assignments.

151.    In response to these complaints, Mr. Kim, Mr. Fox, and Mr. Hammond again told Plaintiff Martinez and his Mexican/Latino coworkers they should return to Mexico if they did not like the working conditions.

152.    Beginning in or around late August 2022, Plaintiff Martinez and his Mexican/Latino TN visa coworkers complained that their American and non-Latino coworkers performing the same tasks as them were being paid a higher hourly rate. They began to raise these additional complaints during their daily meetings with GFA management.

153.    In response to the Mexican/Latino TN workers' complaints about discriminatory wage rates beginning in late August 2022, Mr. Kim, Mr. Fox, and

Mr. Hammond again responded by telling the workers they should return to Mexico if they did not like their wages.

154.    While Plaintiff Martinez was employed at GFA's McDonough Warehouse, GFA managers repeatedly told him he should return to Mexico if he did not like his treatment.

155.    GFA also communicated to Plaintiff Martinez and the other Mexican/Latino TN visa workers that if they were to quit or be fired, they would have to leave their apartments immediately.

156.    On December 4, 2022, Plaintiff Martinez reached his breaking point, as it appeared the risks of leaving were less severe than the harm he experienced because of GFA's discriminatory and illegal treatment of him and other Mexican/Latino TN visa holders. He was at this point constructively discharged and ended his employment with GFA. He paid for his own return to Mexico at a cost of approximately $795.

### D.    Plaintiff Soriano

157.    Plaintiff Soriano was born and raised in Mexico. She is a Mexican citizen. She was educated and trained as a pharmaceutical chemist and worked as a professional chemist in Mexico for approximately six years before her joint employment with GFA and Glovis.

158.    In or around early July 2022, Plaintiff Soriano was recruited by GFA to work as an Industrial Engineer through the TN visa program. She applied to an engineering job posting on Indeed.com, and was contacted by a Korean woman named Laura who identified herself as a GFA representative.

159.    GFA recruited Plaintiff Soriano pursuant to GFA and Glovis's scheme to recruit high-skilled and hard-working Mexican workers for the Glovis West Point Warehouse.

160.    On or about July 6, 2022, Plaintiff Soriano had an interview with GFA representative Laura. Plaintiff Soriano participated in a series of interviews with GFA.

161.    In or around late July 2022, Laura informed Plaintiff Soriano that she had been selected for the engineering position she applied for.

162.    On or around August 12, 2022, GFA provided Plaintiff Soriano with an Offer Letter on GFA letterhead and signed by Lacey Maxwell, GFA HR Generalist and Company Representative. (Doc. 1-7). The Offer Letter specified that Plaintiff Soriano would work as an Industrial Engineer, consistent with her job application, interviews, and professional background. *Id.*

163.    The Offer Letter was provided to Plaintiff Soriano as part of the scheme in which Glovis and GFA had agreed to the recruitment of TN visa workers for manual labor positions at the Glovis West Point Warehouse.

164.   At the time Ms. Maxwell signed the Offer Letter, she knew the job described in the Offer Letter was non-existent.

165.   Plaintiff Soriano accepted the job offer and signed the Offer Letter the day she received it, in reliance on the misrepresentations in the Offer Letter.

166.   At the same time GFA transmitted the job offer, it sent a Support Letter to Plaintiff Soriano. Plaintiff Soriano's Support Letter was on GFA letterhead and was addressed to "Acting Nonimmigrant Visa Section Chief, American Consulate General," and signed by Lacey Maxwell, HR Generalist at GFA. (Doc. 1-8).

167.   The Support Letter specified Plaintiff Soriano would work as an Industrial Engineer, that this role was "professional and specialized in nature and qualifies as Engineer under Appendix 1603.D.1. to Chapter 16 of the NAFTA. The requirements for an Engineer, as listed in Appendix 1603.D.1, is a Bachelor or Licenciatura Degree; or state/provincial license."

168.   The Support Letter provided a detailed job description for the Industrial Engineer position at GFA and specified Plaintiff Soriano's duties would include the following technical services:

1. Ensure that warehousing processes are developed in accordance with the quality system, through the implementation of process analysis and promoting corrective and preventive actions by CAPA system that results in continuous improvement was implementing by the quality circle plan, do, check, act.
2. Support warehouse activities in the areas of packaging validation, quality process development and attention to customer issues
3. Ensure that the inventory meet optimal storage conditions to satisfy the customer requirements, through the implementation of advanced quality planning and monitoring.
4. Identify and coordinate the implementation of multiple projects and activities of the quality system with a focus on a complete quality assurance scheme
5. Implement strategies and systems processes of inventory analysis and improvement
6. Participate in the internal audits of the quality system to identify and classify all the quality issues by their risk level.
7. Support in the accomplishment of the policies and quality objectives through KPIs implementation for personal and teamwork

169.   At the time Ms. Maxwell signed the Support Letter, she knew the position described in the Support Letter was non-existent.

170.   The Support Letter was sent pursuant to the fraudulent scheme of Glovis and GFA to secure TN visa workers for manual labor positions at the West Point Warehouse.

171.   That same day she received the Support Letter and Job Offer, Plaintiff Soriano accepted GFA's offer of employment. In reliance on GFA's representations about the job in the U.S., on or about September 1, 2022, she quit her job as a chemical analyst with Asofarma of Mexico.

172.   In the same August 12, 2022 email, GFA also included an Information Letter dated August 1, 2022. (Doc. 1-9). The Information Letter contained side-by-side representations about the job in Spanish and English. Plaintiff Soriano's English comprehension is limited. Because GFA provided the Information Letter in English and Spanish, she only reviewed the Spanish version.

173.   In Spanish, the Information Letter said that Plaintiff Soriano would perform operations work (*trabajo operativo*) in a Kia warehouse in Alabama—consistent with her experience, her qualifications, and the TN visa requirements. However, in English, the Information Letter instead said that she would perform physical labor.

174.   Based on what Laura had told her about the job, Plaintiff Soriano understood any physical labor involved to be minimum job requirements, and not a manual labor position. Engineers sometimes engage in physical labor at facilities, but Plaintiff Soriano reasonably believed the position offered was not a non-engineering manual labor position because such position would directly contradict the express terms of the Offer Letter, the Support Letter, and the Information Letter's Spanish text; would be contrary to Plaintiff Soriano's experience and qualifications; and would be contrary to the TN visa qualifications. Laura confirmed this understanding by expressly stating that physical labor would be a minor part of the engineering job.

175.   At the time GFA transmitted the Information Letter to Plaintiff Soriano, it knew that its description of the role as operations work, as set forth in Spanish in the Information Letter, was false.

176.   GFA provided Plaintiff Soriano with a false description of the job in Spanish that matched her experience, her qualifications, and the TN visa

requirements in order to induce her to accept its offer of employment in furtherance of its fraudulent scheme.

177.    On or about September 5, 2022, Laura told Plaintiff Soriano via phone calls and messages that GFA needed her to return a signed copy of the Information Letter as soon as possible.

178.    On or about September 6, 2022, Plaintiff Soriano met with GFA staff at GFA's office in Mexico City, Mexico, including Laura. Laura reiterated that Plaintiff Soriano would be performing engineering work with GFA. She told Plaintiff Soriano that there was a job opening in a GFA-operated health supply warehouse and that she would be assigned to work there, consistent with her experience as a pharmaceutical chemist.

179.    In the same meeting, Laura required Plaintiff Soriano to sign the Offer Letter and the Information Letter again.

180.    Laura prepared Plaintiff Soriano for her interview with the Consular Section of the U.S. Embassy. Laura told Plaintiff Soriano that in her interview, she should specify that she would be performing the engineering activities listed in the Support and Offer Letters, or else the visa application would be rejected. She told Plaintiff Soriano to show the consular official her passport, diploma, professional engineering license, and diplomas from courses she had taken. In reliance on the misrepresentations in the Offer Letter and Support Letter, Plaintiff

Soriano spent considerable money for visa fees and to travel for consular processing, to travel to and within the United States to begin her employment with GFA, and to purchase work supplies and household goods in the United States. These expenditures included, but were not limited to, the following:

  a.  Approximately $550 in visa processing fees;

  b.  Approximately $35 in travel expenses to arrive at the U.S. Embassy for her TN visa interview;

  c.  Approximately $20 for travel to the Mexico City airport;

  d.  Approximately $140 for checked luggage for travel to Georgia;

  e.  Approximately $80 for safety boots for work;

  f.  Approximately $60 for denim jeans required for warehouse work;

  g.  Approximately $39 for apartment supplies;

  h.  Approximately $150 for a bicycle and helmet for local transportation in Georgia.

181. In her interview with the Consular Section of the U.S. Embassy, Plaintiff Soriano presented GFA's Offer Letter and Support Letter. On or about September 8, 2022, the U.S. Consulate, in reliance on GFA's misrepresentations in the Offer Letter and Support Letter, issued a TN visa for Plaintiff Soriano to work with GFA as an Engineer.

182.    In or around November 2022, Plaintiff Soriano arrived in West Point, Georgia and began work for GFA and Glovis at Glovis's West Point Warehouse.

183.    When Plaintiff Soriano arrived at the West Point Warehouse on or around November 17, 2022, she was surprised to discover that GFA and Glovis assigned her to manual labor, without engineering duties.

184.    For approximately her first week of work, she was required to work in the "steps" area, where she moved automobile parts instead of the engineering work she had been promised.

185.    Plaintiff Soriano's immediate supervisor, Jorge Encinas, then moved her to the "belower" area, where she had to move large, heavy boxes instead of the engineering work she had been promised.

186.    Around early December 2022, Plaintiff Soriano was reassigned to work as a "picker" in the "door garnish" area, where she had to pull and move large boxes filled with heavy car parts instead of the engineering work she had been promised.

187.    Plaintiff Soriano complained to GFA that she had been hired as an engineer and requested engineering duties. The request was denied. At no point did GFA or Glovis assign Plaintiff Soriano the engineering work GFA had promised her, and that GFA had told U.S. government she would perform.

188.    While employed by GFA and Glovis, Plaintiff Soriano worked eleven-hour shifts, five or six days each week. Her schedule and daily assignments depended on Glovis's needs and production schedule.

189.    Plaintiff Soriano regularly worked in excess of 40 hours in a work week. For example, from January 9, 2023 to January 15, 2023, she worked for at least 57.5 hours, and from January 23, 2023 to January 29, 2023, she worked for at least 46 hours.

190.    Plaintiff Soriano's supervisor Jorge Encinas provided a link to a Glovis digital application (subsequently identified as "Just in Sequence") and instructed Plaintiff Soriano to install the application on her phone. This Glovis digital application gave her the daily work schedule and work assignments, and it allowed Glovis to monitor her work by the minute.

191.    Through the application, Glovis directed Plaintiff Soriano and other similarly situated workers to the areas of production that Glovis determined were deficient and instructed the workers to speed up production in these areas.

192.    When Plaintiff Soriano completed the scheduled orders for each day, the Glovis application would indicate that she was "in the green," meaning that she had complied with her job duties for the day.



*The Glovis digital application identified to Plaintiff Soriano as Just in Sequence, hosted on glovisga.com, where Glovis dictated her work tasks and monitored her progress.*[9]

---



*A Glovis-branded instruction manual for the Glovis digital application identified to Plaintiff Soriano as Just in Sequence, hosted on glovisga.com.[10]*

193.    Through the Glovis digital application and Glovis's in-facility computer screens, Plaintiff Soriano learned what work and what pieces needed to be prioritized. Plaintiff Soriano understood that her GFA supervisors had access to additional Glovis systems, and they used that information to tell the workers when production needed to be doubled or delivery times needed to be reduced.

_____

[10] https://gcs.glovisga.com/monitor/manual/JIS23.pdf (last viewed Oct. 14, 2024).

On at least two occasions in December 2022, Plaintiff Soriano's supervisors asked her to stay longer at the facility because Glovis's production needs had increased.

194.   Plaintiff Soriano observed a posting on a bulletin board within the West Point Warehouse indicating TN visa workers could renew their I-94s. The notice bore the GFA and Kia logos.

195.   Glovis had actual knowledge that TN visa workers were working in the plant pursuant to its agreement with GFA.

196.   None of the TN visa workers worked as engineers or in other professional or technical positions that satisfied the requirements for the TN visa.

197.   Due to its supervision of Plaintiff Soriano and other workers, Glovis knew that those workers had been hired through GFA, and were performing work that did not qualify for the TN visa program.

198.   Plaintiff Soriano observed that Glovis supervisors wearing Glovis badges would tour the warehouse. She observed her GFA supervisors telling the Glovis supervisors what position she was working in.

199.   Plaintiff Soriano's supervisor, Dustin Miller, explained to Plaintiff Soriano and her colleagues that the Glovis supervisors had come to supervise their work and to ensure Glovis's digital systems for monitoring their work were operational. Plaintiff Soriano also observed that a digital kiosk inside the

warehouse had a screen where employees could review each worker's name, photo, and which company employed them directly.

200.   Plaintiff Soriano's supervisors required her to join a WhatsApp group for TN workers, titled "Grupo de WhatsApp TN 1st shift."

201.   In the WhatsApp group, Plaintiff Soriano's supervisors provided the TN workers with a document titled "Glovis Georgia 2023 Working Day Calendar" that detailed pay dates, work days, holidays, shutdown days, and production schedules for different shifts. The document bore the Hyundai Glovis logo.

202.   In the WhatsApp group, Plaintiff Soriano's supervisors provided the TN workers with a document dated January 18, 2023, and addressed to "Kia Georgia Team Members" that said that first shift workers—like Plaintiff Soriano— were assigned to work on the upcoming Saturday. The document bore the Kia logo.

203.   During her employment by GFA and Glovis, Plaintiff Soriano learned that GFA and Glovis were paying her and her Mexican/Latino coworkers less than what they paid American and non-Latino workers with similar jobs or jobs with fewer job responsibilities. One of the American and non-Latino employees who was also a picker like Plaintiff Soriano told her he earned $16.50 per hour. Before deductions, Plaintiff Soriano only earned about $11 per hour.

204.    Plaintiff Soriano complained to her immediate supervisor—Jorge Encinas—that Defendants were paying American and non-Latino workers more than Plaintiff Soriano and her Mexican/Latino coworkers for the same or similar work. Mr. Encinas confirmed that non-Mexican/Latino workers were paid more than Mexican/Latino workers. Mr. Encinas—a Mexican/Latino man –also confirmed that he himself also earned less than American and non-Latino workers.

205.    According to Glassdoor.com, Industrial Engineers employed at GFA earn between $79,000 and $123,000 per year, and Engineers employed at Glovis earn between $88,000 and $156,000 per year.[11] GFA and Glovis paid these higher wages to employees, such as American and Korean employees, who were not Hispanic/Latino or of Mexican origin.

206.    The only persons hired as Industrial Engineers who were not employed as engineers were those persons who were Hispanic/Latino or of Mexican national origin.

207.    Plaintiff Soriano and the other Mexican/Latino TN visa holders hired as engineers were discriminated against and earned considerably less than

---

[11]    https://www.glassdoor.com/Salary/GFA-Alabama-Industrial-Engineer-Salaries-E7802633_D_KO12,31.htm (last viewed June 19, 2024); https://www.glassdoor.com/Salary/Hyundai-Glovis-Engineer-Salaries-E292394_D_KO15,23.htm (last viewed June 19, 2024).

American and non-Latino, non-Mexican employees with equivalent professional qualifications, who GFA and Glovis hired and employed as engineers.

208.   Plaintiff Soriano also observed that Defendants allowed American and non-Latino workers working in the same or similar position as her to take more breaks than it allowed Plaintiff Soriano and her Mexican/Latino coworkers to take.

209.   One of Plaintiff Soriano's managers, Dustin Miller, got angry when Plaintiff Soriano and her Mexican/Latino coworkers spoke in Spanish and told them to stop speaking Spanish. This manager said repeatedly that it was "sickening" to hear them speak in Spanish.

210.   Mr. Miller did not prohibit English-speaking employees from communicating with their coworkers in English.

211.   During her employment, Plaintiff Soriano and her Mexican/Latino TN coworkers were required to live in and pay for employer-procured housing, and travel between the employer-procured housing and the Glovis campus in—and pay for—an employer-procured vehicle. Plaintiff Soriano had to share a crowded, cockroach-infested three-bedroom, two-bathroom apartment with five other employees. She would often have to wait 90 to 120 minutes to use the bathroom. The beds in the apartment—bunk beds with fragile frames and thin mattresses—seemed improvised. Once, she sat down on her bed and it collapsed,

leaving her to use the floor instead. GFA changed the bed out for another of similarly poor quality. GFA forbade her and other residents of the apartments from having visitors.

212.   Plaintiff Soriano's employers deducted $100 per week for housing and transportation costs from her pay. These deductions were not identified or reflected in her paystubs. In addition to these deductions, Plaintiff Soriano and the other Mexican/Latino TN visa holders were each required to pay $10 per week in cash for gas to the van driver on duty.

213.   GFA and Glovis did not require American and non-Latino workers in the same role as Plaintiff Soriano to live in and pay for employer-procured housing or to use employer-procured vehicles.

214.   Plaintiff Soriano observed that the amount deposited in her bank account was consistently $100 less than the amount reported on her paystubs.

215.   As a result of the off-the-books $100 weekly deduction and $10 weekly cash kickback, Plaintiff Soriano and the other Mexican/Latino TN visa holders consistently earned an overtime rate of pay that was less than one-and-one-half times their regular rate of pay.

216.   Plaintiff Soriano often worked overtime hours in excess of 40 hours in a workweek and was not paid overtime at the rate of 1 ½ times her regular rate of pay for the hours in excess of 40 hours in the workweek.

217.    Plaintiff Soriano and the other Mexican/Latino TN workers could not freely use the GFA-provided transportation, which only transported them between the West Point warehouse and the employer-provided housing, or on occasional trips to buy groceries. These trips were so infrequent that Plaintiff Soriano had to buy a bicycle and helmet so she could go to the store for groceries.

218.    Defendants GFA and Glovis provided the housing and transportation primarily for the benefit and convenience of GFA and Glovis.

219.    Plaintiff Soriano's and other similarly situated Mexican/Latino workers' acceptance of the housing and transportation was not voluntary.

220.    Conditions in the housing did not comply with applicable federal, state, or local laws.

221.    On information and belief, Defendants GFA and Glovis did not maintain accurate records of the cost incurred in furnishing the housing and transportation.

222.    The $100 weekly deduction and $10 weekly cash kickback from Plaintiff Soriano's and other similarly situated Mexican/Latino workers' wages exceeded the reasonable cost and fair value of the housing and transportation.

223.    As a result of these off-the-books kickback deductions from their pay, Plaintiff Soriano and the other Mexican/Latino TN visa holders consistently

earned an overtime rate of pay that was less than one-and-one-half times their regular rate of pay.

*Plaintiff Soriano's Pregnancy*

224.   On or around December 31, 2022, Plaintiff Soriano learned she was pregnant.

225.   On or around January 8, 2023, after Plaintiff Soriano had been moved to the door garnish area and required her to perform heavy lifting, she informed her GFA team leader, Humberto, and other GFA managers that she was pregnant. She asked them to assign her to a light-duty job because of her pregnancy, explaining that she felt very intense pinprick sensations in her belly every time she had to move large, heavy boxes. In response to Plaintiff Soriano's request for a reasonable accommodation, GFA and Glovis refused to engage in an interactive dialogue regarding her request.

226.   Instead, management harassed her for having become pregnant. GFA managers told her on several occasions that GFA had never employed a pregnant worker with a TN visa, and that she should return to Mexico because of her pregnancy. A GFA manager, Jorge Encinas, also told Plaintiff Soriano several times that if she did not return to Mexico because of her pregnancy, GFA would probably fire her. Mr. Encinas also told her that what she and her husband had done—becoming pregnant—was very wrong.

227.    In these same conversations, Mr. Encinas told Plaintiff Soriano that "all worker information" was shared with Glovis because Glovis was in charge and Glovis made the decisions, including decisions about which workers stayed and which were to be fired. Mr. Encinas told her multiple times that Glovis did not approve of her having become pregnant because Glovis gave her the opportunity to work legally in the U.S.

228.    Plaintiff Soriano understood that Glovis was aware of her pregnancy and disapproved of it.

229.    Plaintiff Soriano continued to perform the essential functions of her job without accommodation, but she continued to feel pain when she engaged in heavy lifting. She feared that the heavy lifting would harm her pregnancy.

230.    After she disclosed her pregnancy, Plaintiff Soriano noticed that Mr. Encinas and team leader Humberto began visiting her work station much more frequently to check on her progress and to count materials, like dollies. She observed that Mr. Encinas and Humberto did not subject other non-pregnant workers to this kind of increased scrutiny.

231.    Plaintiff Soriano eventually learned from Hector, a colleague who worked in the same area, that after she requested an accommodation, GFA managers had told her coworkers explicitly that they must not help anyone in her

area. Far from receiving an accommodation, Plaintiff Soriano saw her work become more difficult because, on GFA's instructions, no one would help her.

232.    Several days after Plaintiff Soriano informed her GFA supervisor and managers that she was pregnant, GFA manager Jorge Encinas and GFA HR Generalist Lacey Maxwell told her that they could not change her work area unless she had a doctor's note explaining her restrictions. Plaintiff Soriano then asked for permission to take time off to go to the doctor. Plaintiff Soriano's managers refused to give her time off. Plaintiff Soriano asked repeatedly for time off, but they continued to refuse. Finally, after two or three weeks, GFA team leader Humberto gave Plaintiff Soriano written permission for time off for a medical appointment on February 6, 2023, to get a doctor's note about the medical restrictions related to her pregnancy.

233.    Plaintiff Soriano observed that GFA managers allowed non-pregnant workers, including workers who suffered injuries, to change work areas and perform light-duty work without requiring medical documentation.

234.    For example, on or around January 25, Plaintiff Soriano's non-pregnant roommate told her that she had been transferred to a light-duty area—the so-called "Steps" area—after she asked her supervisors for a change. GFA did not require Plaintiff Soriano's roommate to provide a doctor's note or a medical opinion before making the change.

51

235.   After Plaintiff Soriano learned about her roommate's transfer, Plaintiff Soriano asked her immediate supervisor, Jorge Encinas, about why GFA had moved her roommate without a doctor's note but refused to move Plaintiff Soriano to a light-duty job without a doctor's note. Mr. Encinas said he did not know.

236.   Plaintiff Soriano learned that Defendants also discriminated against other pregnant workers. Near the end of December 2022, another pregnant worker who worked for Glovis in the same area as Plaintiff Soriano was fired. Several of Plaintiff Soriano's coworkers told her it was because that worker's pregnancy was beginning to show.

237.   Another colleague who worked for GFA and Glovis, and who became pregnant around the same time as Plaintiff Soriano, asked to be changed to another shift and was also denied. Like Plaintiff Soriano, this pregnant coworker had to lift heavy loads at work. She told Plaintiff Soriano that her supervisor did not want to change her shift because she was pregnant. This pregnant coworker had multiple vaginal bleeds and eventually miscarried.

238.   A third pregnant colleague who worked for Glovis told Plaintiff Soriano that she decided not to reveal her pregnancy or ask for light duty because of how Defendants discriminated against Plaintiff Soriano and other co-workers when they revealed their pregnancies and asked for light duty.

239.   On or about February 1, 2023—twenty-four days after she disclosed her pregnancy—Plaintiff Soriano's managers gave Plaintiff Soriano her first disciplinary report. They claimed Plaintiff Soriano had left her workplace without completing her assigned orders. Plaintiff Soriano observed that none of the other non-pregnant employees in the same or similar roles as her who left their workstation under the same circumstances received a disciplinary report.

240.   Plaintiff Soriano believes the GFA managers gave her a disciplinary report to retaliate against her for being pregnant and asking for a lighter-duty job. Plaintiff Soriano had never received a disciplinary report or warning from her employer until she revealed she was pregnant.

241.   On or about February 4, 2023, Plaintiff Soriano's team leader Humberto required her team to perform extra work, even though Plaintiff Soriano's team had already completed the scheduled orders for the day. At the time she was assigned the additional work, Plaintiff Soriano had completed her daily production quota assigned by Glovis and reflected in its digital application. Plaintiff Soriano's abdomen hurt intensely, and she feared the additional heavy labor would harm her pregnancy, but she complied with Humberto's directive and worked to fill the new orders.

242.   That day, a GFA supervisor issued a disciplinary write-up to Plaintiff Soriano in the GFA managers' offices, claiming that Plaintiff Soriano had not

complied with her job duties. Plaintiff Soriano refused to sign the disciplinary action form because she had observed that she had met her daily production quota according to the Glovis digital application which monitored each employee's progress.

243.    When Plaintiff Soriano refused to sign the disciplinary action form on February 4, 2023, GFA manager Dustin Miller threatened that if she refused to leave the Glovis premises, he would call the police. Plaintiff Soriano did not understand what was happening or why Mr. Miller was calling the police.

244.    Soon, the police arrived and told Plaintiff Soriano that she would have to leave because she had been fired. Plaintiff Soriano told the police she had not been fired. The police then spoke with Mr. Miller. The police escorted Plaintiff Soriano to her apartment. The police clarified that Plaintiff Soriano had not been fired and could return to work the following Monday.

245.    Upon information and belief, Glovis had security measures in place at the West Point Warehouse and therefore had to approve the request that police officers enter Glovis's premises, knew that the police had been called to its West Point Warehouse, had to have inquired why the police were called and the circumstances of the police escorting Plaintiff Soriano off the premises, and knew or should have known that Plaintiff Soriano was escorted off the premises due to and in retaliation for becoming pregnant and requesting light duty.

246.    On or about Monday, February 6, 2023, Plaintiff Soriano had her first prenatal appointment—the appointment for which she had initially requested and been denied time off. Plaintiff Soriano told her doctor that she had experienced pain and unusual vaginal bleeding during her pregnancy. Plaintiff Soriano's doctor asked her how heavy the objects she lifted at work were, and Plaintiff Soriano told her that they were over 50 pounds. In a medical note, Plaintiff Soriano's doctor stated that Plaintiff Soriano could not safely move or lift more than 25 pounds.

247.    On the same day that Plaintiff Soriano had her first prenatal appointment, she received an email from GFA manager Darin Brown telling her to come to his office. In Brown's office, Plaintiff Soriano informed Brown of her doctor's appointment and accommodation request to not lift more than 25 pounds. Brown fired her. He claimed, without providing specifics, that Plaintiff Soriano had not complied with employment policies. He also said that Plaintiff Soriano had one hour to vacate her GFA-procured apartment.

248.    Plaintiff Soriano never stopped performing the essential functions of her job without accommodation.

249.    GFA and Glovis could have accommodated Plaintiff Soriano's request for light duty and to not lift more than 25 pounds by placing her in other warehouse positions such as in the "steps" area or other areas in the warehouse,

or as an engineer. GFA and Glovis could also have provided assistive equipment, or placed her in a position where others could assist with any heavy lifting.

250.    GFA and Glovis failed to engage in an interactive process relating to the Mr. Soriano's accommodation request or her needs. Ms. Soriano remained able to perform the essential functions of jobs in the West Point Warehouse.

251.    With accommodation such as a dolly, forklift, or helper, she also could have performed the essential functions of her existing job.

252.    Plaintiff Soriano was terminated from her position at GFA and evicted from her apartment on February 6, 2023. She paid for her own return to Mexico at a cost of approximately $1,362.

253.    GFA and Glovis, which was the final decision maker relating to the work status of Plaintiff Soriano and other West Point Class members, discriminated against Plaintiff Soriano based on her pregnancy intentionally and with malice. Glovis affirmed and reaffirmed the termination of Plaintiff, her removal from the West Point Warehouse by the police, and the scheme of retaliating against her for becoming pregnant, and the decision not to accommodate her needs.

254.    Glovis and GFA intentionally discriminated against Plaintiff Soriano and retaliated against her because she was pregnant.

### E.    RICO Conspiracy and Overt Act Allegations

255.    Plaintiffs plead the existence of a conspiracy and overt acts to violate the Georgia RICO pursuant to O.C.G.A. § 16-4-4(c)(1) and (2).

256.    Defendants GFA and Glovis conspired with each other to fraudulently secure Plaintiffs' and other TN visa holders' manual labor by committing mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; fraud in foreign labor contracting in violation of 18 U.S.C. § 1351; and visa fraud in violation of 18 U.S.C. § 1546.

257.    Defendant Glovis knew of Defendant GFA's goal to fraudulently secure Plaintiffs' and other TN visa workers' manual labor.

258.    Defendant Glovis voluntarily participated in helping to accomplish that goal.

259.    Defendants GFA and Glovis committed overt acts in furtherance of the goal of fraudulently securing Plaintiffs' and other TN visa workers' manual labor, including, *inter alia*.

<u>Conduct Defined as "Racketeering"</u>
<u>Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343!</u>

260.    As set forth in the preceding paragraphs, GFA, through the RICO Enterprises, used the mails and wire communications, including communications via telephone, fax, internet, and/or email, on numerous occasions to make false statements and further these fraudulent schemes.

261.    The mail and wire fraud by GFA was committed in conspiracy with and pursuant to the direction of Glovis to secure TN visa workers to fill manual labor positions at the West Point Warehouse.

262.    Glovis knew that GFA was making these misrepresentations to secure TN visa workers to perform low skilled manual labor jobs at the West Point Warehouse.

263.    These willful, knowing, and intentional acts by GFA and Glovis constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

<u>Fraud in Foreign Labor Contracting: 18 U.S.C. § 1351</u>

264.    As set forth in the preceding paragraphs, GFA, through the RICO Enterprises, knowingly and with intent to defraud, recruited, solicited, and hired Plaintiffs and other Class members outside the United States for the purpose of employment in the United States by means of materially false or fraudulent pretenses, representations, or promises regarding the nature of Plaintiffs' and other GFA Class members' work.

265.    Glovis acquired an interest in personal property and increased profits by knowingly and with intent to defraud, recruited, solicited, and hired Plaintiffs and other Class members outside the United States for the purpose of employment in the United States by means of materially false or fraudulent pretenses,

representations, or promises regarding the nature of Plaintiffs' and other GFA Class members' work.

266.   Glovis committed predicate acts of racketeering by knowingly and with intent to defraud by causing and requesting GFA to recruit, solicit, and hire Plaintiffs and other TN visa workers outside the United States, for purposes of employment in the United States by means of materially false or fraudulent pretenses, representations or promises regarding that employment.

267.   These willful, knowing, and intentional acts by GFA and Glovis constitute fraud in foreign labor contracting in violation of 18 U.S.C. § 1351.

<u>Visa Fraud: 18 U.S.C. § 1546</u>

268.   As set forth in the preceding paragraphs, GFA, through the RICO Enterprises, (a) knowingly subscribed as true multiple false statements with respect to material facts in the TN visa application materials required by immigration laws and regulations, and (b) knowingly presented the materials to Plaintiffs, other TN visa candidates, and U.S. visa-issuing authorities.

269.   The TN visas would not have been issued to Plaintiffs and others but for the false statements concerning the work to be performed by Plaintiffs and others at GFA's facilities.

270.   The visa fraud committed by GFA was in conspiracy with Glovis to further the scheme to recruit inexpensive highly skilled labor from Mexico.

271.   Glovis committed visa fraud in violation of 81 U.S.C. § 1546 by knowingly accepting and receiving the TN visas of the TN visa workers as authorization to stay or be employed in the United States while knowing that the TN visa was procured by means of false claims and statements, and to have been otherwise procured by fraud or unlawfully obtained.

272.   Glovis knew that the TN visa did not apply to the manual labor positions in which it placed the GFA-recruited TN visa workers.

273.   Glovis knew – due to the many TN visa workers that quit and complained that they were not placed in promised positions – that GFA made false promises that the TN visa workers would work in engineering and technical positions that qualify under the TN visa program.

274.   Glovis is a sophisticated company that is part of an international organization. It knew that the TN visa applied only to skilled professional workers. Glovis knew that the Mexican workers that GFA recruited could not secure TN visas based on the job positions that Glovis assigned to the TN visa workers that GFA recruited.

275.   Despite the knowledge identified in the previous three paragraphs, Glovis continued for several years to direct GFA to recruit TN visa workers in Mexico, and continued to accept such TN visa workers for unskilled manual labor positions.

276.    Glovis committed predicate acts of racketeering by engaging and requesting that GFA recruit Mexican workers pursuant to the TN visa program when the job positions available at Glovis facilities were manual labor positions that did not qualify for the TN visa program.

277.    These willful, knowing, and intentional acts by GFA and Glovis constitute fraud and misuse of visas, permits, and other documents in violation of 18 U.S.C. § 1546.

<u>Visa Fraud: 18 U.S.C. § 1546</u>

278.    As set forth in the preceding paragraphs, GFA, individually and through the RICO Enterprises, falsified Plaintiffs' and other GFA Class Members' wages in submissions to the Georgia Department of Revenue, knowing the statements to the Georgia Department of Revenue were false.

279.    These knowing and willful acts constitute false statements and writings, in violation of O.C.G.A. § 16-10-20.

**F.    Class Employment Discrimination Allegations**

280.    Other employees of GFA and Glovis who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic/non-Latino ("American and/or non-Latino"), performed manual labor in the same or similar positions as Plaintiffs and other class members.

281.   Plaintiff Martinez earned substantially less per hour than the McDonough Warehouse employees of GFA who were U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic/non-Latino who were in the same or similar positions and employees of GFA.

282.   These non-Mexican/Latino McDonough Warehouse employees who were paid more per hour than Plaintiff Martinez and other Mexican/Latinos performed the same work on the same production lines, with the same job duties and performance metrics set by GFA, and with the same quality of work performance.

283.   Plaintiff Soriano earned substantially less per hour than the West Point Warehouse employees of GFA and Glovis who were U.S. citizens or nationals, Korean citizens or nationals, non-Mexican nationals, and/or non-Hispanic/non-Latino who were in the same or similar positions and employees of GFA and Glovis.

284.   Employees of GFA who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic/non-Latino are or were not consistently required to work at the McDonough Warehouse and West Point Warehouse more than 40 hours per week in the same or similar manual labor positions as Plaintiffs.

285.   Employees of GFA who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic/non-Latino are or were not required to have

advanced technical or engineering degrees or job experience, as Plaintiffs were required to have.

286.  GFA at the McDonough Warehouse, and GFA and Glovis at the West Point Warehouse, have a pattern and practice of paying employees who are U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic/non-Latino higher wages than employees who are non-U.S. citizens, Hispanic/Latino, and of Mexican national origin.

287. Plaintiffs also learned that employees working at the GFA McDonough Warehouse and the GFA/Glovis West Point Warehouse who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic/non-Latino and performed the same work as Plaintiffs were not required to hold college degrees, much less the advanced technical or engineering degrees that Plaintiffs were required to have.

288.  Defendants did not require employees who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic/non-Latino and performed to same work as Plaintiff to live in employer-acquired housing, use employer-provided transportation, or make wage deductions for housing and transportation.

289.  Plaintiffs were discriminated against also because engineers who were U.S. or Korean citizens or nationals, non-Mexican nationals, and non-

Hispanic/non-Latino were not required to work manual labor positions at low wages. Instead, such persons were hired in skilled positions, earning higher wages for fewer hours and better working conditions.

**E.    Class False Information Returns Allegations**

290.   Defendant GFA intentionally submitted false information returns that over-reported the wages Plaintiffs and other similarly situated workers earned in quarterly and annual information returns GFA filed with the U.S. Internal Revenue Service ("IRS"), including Plaintiffs' and other similarly situated workers' W-2 forms.

291.   The over-reporting of Plaintiffs' and other similarly situated workers' wages resulted from the illegal off-the-books kickbacks the workers were required to pay to GFA each week for housing and transportation.

292.   In January 2023, GFA issued fraudulent W-2 forms on behalf of TN visa holders over-reporting their taxable earnings.

293.   In January 2024, GFA issued fraudulent W-2 forms on behalf of Plaintiffs and other TN visa holders over-reporting their taxable earnings.

294.   GFA, through the RICO Enterprises, similarly misrepresented Plaintiffs and other TN visa holders' wages in quarterly returns and other filings submitted to the Georgia Department of Revenue in 2023 and 2024.

64

295.    As a consequence of the false information returns, Plaintiffs and other TN visa holders suffered economic damages, including payment of taxes that exceeded their tax liability and preparer and accountant fees to correct the misrepresentations.

## VIII.  Class Action Allegations

296.    Plaintiffs bring their breach of contract and Georgia RICO claims on behalf of themselves and a putative class of persons ("the GFA Class" or "the Class") consisting of:

> All individuals who, between June 20, 2019 and the present, who (1) were hired by GFA; (2) were employed at the McDonough Warehouse or West Point Warehouse; (3) received wages from GFA; and (4) were TN visa holders.

297.    Plaintiff Martinez brings his Title VII and Section 1981 claims individually and on behalf of a putative subclass of persons ("the McDonough Subclass") consisting of:

> All individuals of the GFA Class who (1) were employed at the McDonough Warehouse; and (2) were non-white Hispanic or Latino, non-U.S. citizens, and of Mexican national origin.

298.    Plaintiff Soriano brings her Section 1981 and non-pregnancy-related Title VII claims individually and on behalf of a putative subclass of persons ("the West Point Subclass") consisting of:

> All individuals of the GFA Class who (1) were employed at the West Point Warehouse; and (2) were non-white Hispanic or Latino, non-U.S. citizens, and of Mexican national origin.

299.   Excluded from the Class are the legal representatives, officers, directors, assigns, and successors of Defendants; any individual who at any time during the Class periods has had a controlling interest in any Defendant; and all persons who submit timely and otherwise proper requests for exclusion from the Class.

### A.   Numerosity

300.   There are over 100 individuals who are members of the Class and Subclasses based on the number of individuals with TN workers hired to work at the McDonough Warehouse and West Point Warehouse.

301.   The members of the Class are sufficiently numerous that joinder of all members is impractical.

### B.   Existence and Predominance of Common Questions

302.   Common questions of law and fact exist as to Plaintiffs and members of the Class and predominate over questions affecting only individual class members.

303.   These common questions include:

a.   Whether GFA breached contractual promises to Plaintiffs and the GFA Class members to provide employment with job duties requiring engineering and/or technical education, experience, and skill at salaries presented in the Support Letters;

b.    Whether GFA and Glovis violated the Georgia RICO in the fraudulent scheme to employ TN visa holders for manual labor positions;

c.    Whether GFA unlawfully discriminated against the McDonough Subclass by paying them less than, requiring them to work longer than, and subjecting them to more arduous and less desirable tasks and harsher discipline than U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic workers;

d.    Whether GFA and Glovis unlawfully discriminated against the West Point Subclass by paying them less than, requiring them to work longer than, and subjecting them to more arduous and less desirable tasks and harsher discipline than U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic workers;

e.    Whether GFA intentionally filed false information returns over-reporting the GFA Class members' wages;

f.    Whether Defendants' actions were undertaken knowingly, willfully, intentionally, and without justification to deprive the putative class and subclass members of their rights, and whether Defendants acted intentionally and with malice or reckless indifference to their federally protected rights.

## C.    Typicality

304.   Plaintiffs and the members of the Class and each Subclass have been subject to the same unlawful practices of Defendants, and their claims arise out of these same practices.

305.   Plaintiffs and members of the Class and Subclasses have the same rights under applicable laws.

306.   Plaintiffs and members of the Class and Subclasses were recruited and employed under the same or similar circumstances giving rise to the same claims.

307.   Plaintiffs and members of the Class and Subclasses suffered similar types of pecuniary damages.

308.   Plaintiffs' claims are typical of the claims of the GFA Class because, among other things, they (a) were the victims of breach of contract under the same fraudulent scheme and were provided substantially similar fraudulent offers of employment; (b) were the victims of wire fraud and visa fraud under the fraudulent scheme to offer them non-existent high paying jobs and require them instead to perform manual labor.

309.   Plaintiff Martinez's claims are typical of the claims of the McDonough Subclass because, among other things, he and the subclass members (a) were TN visa holders; (b) are non-white Hispanic or Latino, non-U.S. citizens, and of Mexican national origin; and (c) suffered from employment discrimination in the

type of work they were required to perform, pay rate, and number of hours worked.

310.    Plaintiff Soriano's claims are typical of the claims of the West Point Subclass because, among other things, she and the subclass members (a) were TN visa holders; (b) are non-white Hispanic or Latino, non-U.S. citizens, and of Mexican national origin; and (c) suffered from employment discrimination in the type of work they were required to perform, pay rate, and number of hours worked.

311.    Plaintiffs' interests are co-extensive with the interests of the Class and Subclass members.

312.    Plaintiffs have no interest adverse to the Class or Subclass members.

313.    Plaintiffs and the Class and Subclasses were offered and did accept the same terms and conditions of employment which Defendants are alleged to have breached.

### D.    Adequacy

314.    Plaintiffs will fairly and adequately represent the interests of the Class and Subclass members. Their interests do not conflict with the interests of the members of the Class and Subclasses they seek to represent.

315.    Plaintiffs understand that, as Class representatives, they assume a responsibility to the Class and Subclasses to represent their interests fairly and

adequately. Plaintiffs have retained counsel experienced in prosecuting class actions and in employment matters. There is no reason why Plaintiffs and their counsel will not vigorously pursue this matter.

**E.    Superiority**

316.    A class action is superior to other available means for the fair and efficient adjudication of the claims at issue herein.

317.    The damages suffered by each individual member of the class and subclasses may not be sufficient to justify the burden and expense, particularly in light of the transnational nature of this case, of individual prosecution of the litigation necessitated by Defendants' conduct.

318.    Further, it would be difficult for members of the Class and Subclasses to obtain individual redress effectively for the wrongs done to them. If individual actions were to be brought by each member of the class and subclasses, the result would be a multiplicity of actions, creating hardships for members of the Class and Subclasses, the Court, and Defendants.

319.    Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.

320.   By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

321.   This case does not present individualized factual or legal issues which would render a class action difficult.

322.   In the alternative, the Class and Subclasses may be certified because: (a) the prosecution of separate actions by the individual members of the Class and Subclasses would create a risk of inconsistent or varying adjudication with respect to individual Class and Subclass members, which would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual class and subclass members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other class and subclass members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Class and Subclasses, thereby making appropriate final and injunctive relief with respect to the members of the Class and Subclasses as a whole.

## IX.   FLSA COLLECTIVE ACTION ALLEGATIONS

323.   Plaintiffs bring their FLSA claims on behalf of themselves and those individuals who may opt into this action pursuant to 29 U.S.C. § 216(b) and who

were not paid required minimum and overtime wages at Defendants' operations in the three years preceding the filing of this Complaint.

324. Plaintiffs bring their FLSA collective actions claims on behalf of two subclasses of workers:

a. <u>McDonough FLSA Subclass</u>: All TN visa holders employed by GFA at GFA's McDonough Warehouse at any time in the three years prior to the filing of this Complaint.

b. <u>West Point FLSA Subclass</u>: All TN visa holders employed by GFA and/or Glovis at Glovis's West Point Warehouse at any time in the three years prior to the filing of this Complaint.

325. All members of the McDonough Subclass and the West Point Subclass (collectively, "the FLSA Subclasses") were damaged due to the failure to pay overtime at the rate of one and a half the proper regular rate of pay.

326. Plaintiffs and other similarly situated TN visa workers in the McDonough FLSA Subclass regularly worked at the McDonough Warehouse in excess of 40 hours per workweek ("overtime") for the duration of their employment.

327. Plaintiffs and other similarly situated TN visa workers in the West Point FLSA Subclass regularly worked at the West Point Warehouse in excess of 40 hours per workweek for the duration of their employment.

328. As a condition of obtaining their employment with the Defendants, Plaintiffs and other similarly situated TN visa holders in the FLSA Subclasses were

required to incur the cost of their TN visas and inbound and outbound travel expenses, which primarily benefitted Defendants, and were not fully reimbursed in Plaintiffs' and members of the FLSA Subclasses' first and final workweeks, effectively reducing Plaintiffs' wages below their required minimum and overtime rates of pay.

329.  Moreover, as a condition of continued employment with the Defendants, Plaintiffs and other similarly situated TN visa holders in the FLSA Subclasses were required to pay weekly kickbacks in the form of "off-payroll" deductions to their employers for the use of employer-procured housing and employer-owned transportation. Plaintiffs and other similarly situated TN visa holders in the FLSA Subclasses paid for this employer-procured housing and employer-owned transportation on behalf of or for the benefit or convenience of Defendants.

330.  Plaintiffs' and other members of the FLSA Subclasses' acceptance of the housing and transportation was not voluntary.

331.  Conditions in the housing did not comply with applicable federal, state, or local laws.

332.  On information and belief, Defendants did not maintain accurate records of the cost incurred in furnishing the housing and transportation.

333.   The weekly deduction from Plaintiffs' and other members of the FLSA Subclasses' wages exceeded the reasonable cost and fair value of the housing and transportation.

334.   As a result of these off-the-books kickback deductions from pay, Plaintiffs and others in the FLSA Subclasses consistently earned an overtime rate of pay that was less than one-and-one-half times their regular rate of pay.

335.   Defendants did not pay Plaintiffs and other members of the FLSA Subclasses overtime wages at a rate of one-and-one-half their regular rate of pay, as required by the FLSA. 29 U.S.C. § 207(a).

336.   The actions and omissions alleged above were willful in that Defendants were aware of their obligations regarding overtime wages, showed reckless disregard for whether their conduct violated the FLSA, or acted without a reasonable basis to believe their actions were in compliance with the FLSA.

337.   Plaintiffs and others in the Subclasses were subject to the same wage policies and practices of the Defendants.

338.   Common proof applicable to Plaintiffs and the others in the FLSA Subclasses will show that the Defendants failed to properly pay required minimum and overtime wages.

339.    Plaintiffs are currently unaware of the identities of all the employees who would be members of the FLSA Subclasses, but this information is readily ascertainable from the Defendants' records.

340.    Defendants therefore should be required to provide Plaintiffs with a list—including last known addresses, telephone numbers, and email addresses if known—of all members of the FLSA Subclasses.

## X.    Causes of Action

### COUNT I
### Breach of Contract under Georgia State Law
### On behalf of the GFA Class against GFA

341.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

342.    This count sets forth a claim by Plaintiffs and other GFA Class members for damages resulting from GFA's breach of contract.

343.    The parties entered into a written contract.

344.    In its contemporaneous Offer Letters and Support Letters, GFA made written offers of employment to Plaintiffs and the GFA Class members which contained material terms of their employment, including that these jobs would be highly skilled engineer positions paying a certain rate of pay which would be eligible for the TN visa.

345.    Plaintiffs and the GFA Class members accepted the material terms of employment offered by GFA in the support letters and forbore other opportunities of employment and undertook certain expenses in exchange for that employment as offered.

346.    GFA did not provide employment to Plaintiffs and the GFA Class members as offered, but rather assigned them to manual labor jobs on its production line which were not eligible for TN visas.

347.    GFA breached their contracts with Plaintiffs and the GFA Class members.

348.    As a result, Plaintiffs and other GFA Class members incurred incidental and consequential damages which they are entitled to recover in full, including but not limited to visa processing fees, unreimbursed travel expenses, relocation expenses, wage underpayments, and lost employment opportunities, and nominal damages.

349.    Plaintiffs and GFA Class members also are entitled to recover nominal damages for Defendants' breach of these contracts.

## COUNT II
### Georgia Racketeer Influenced and Corrupt Organizations Act, Ga. Code. Ann. § 16-14-1 et seq. On behalf of the GFA Class against GFA and Glovis

350.    By this reference, Plaintiffs incorporate the above factual statements as if fully stated herein.

351.   This Count sets forth Plaintiffs' and GFA Class members' claims for damages against GFA and Glovis caused by GFA's and Glovis's violations of the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO").

352.   Each Plaintiff and GFA Class member is an aggrieved person with standing to sue within the meaning of Georgia RICO, O.C.G.A. § 16-14-6(b).

353.   Each Plaintiff and GFA Class member is a person who was injured by reason of violations of O.C.G.A. § 16-14-4. Therefore, Plaintiffs have standing to sue pursuant to Georgia RICO, O.C.G.A. § 16-14-6(c).

354.   GFA and Glovis are associated in fact, and although not a legal entity, are a RICO enterprise (RICO Enterprise I) as defined above, within the meaning of O.C.G.A. § 16-14-3(3).

355.   Other companies who engaged GFA for recruiting Mexican workers also were associated with and participated in the RICO Enterprise I scheme to recruit high-skilled Mexican workers under the TN visa program to perform manual labor jobs.

356.   The RICO Enterprise I scheme included the recruitment of Plaintiffs and other prospective TN visa workers to fill the many manual labor positions that Glovis, GFA, and other RICO co-conspirators need to fill.

357.    Non-party Capital People, GFA, and Glovis are associated in fact, and although not a legal entity, are a RICO enterprise (RICO Enterprise II), as defined above, within the meaning of O.C.G.A. § 16-14-3(3).

358.    The RICO Enterprises I and II, as defined above, are each an association-in-fact enterprise with the common purpose of securing inexpensive manual labor to work at GFA's and Glovis's facilities in violation of immigration laws, and to profit from such labor.

359.    GFA and Glovis acquired and maintained control of personal property and money (in the form of reduced labor costs and recruiting fees) due to their fraudulent activities for a common purpose in the recruitment and staffing of low cost TN visa workers for manual labor through a pattern of numerous acts of racketeering activity in violation of O.C.G.A. § 16-14-4(a).

360.    Glovis was able to increase its profits by paying the highly skilled Plaintiff Soriano and Mexican/Latino workers substantially less than the market wage rate paid to non-Mexican and non-Latino workers.

361.    The increased profits from the less expensive and highly skilled labor was the purpose of the fraudulent scheme.

362.    Glovis was able to increase its profits by paying the highly skilled Plaintiff Soriano and Mexican/Latino workers substantially less than the market wage rate paid to non-Mexican and non-Latino workers.

363.    The increased profits from the less expensive and highly skilled labor was the purpose of the fraudulent scheme.

364.    GFA and Glovis associated with the RICO Enterprises and conducted or participated in the RICO Enterprises through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(b) related by the enterprises' common purpose of securing cheap manual labor and to profit from such labor.

365.    GFA and Glovis conspired and committed overt acts to effect the object of the scheme to acquire and maintain control of real and personal property through the fraudulent activities and to conduct or participate in the RICO Enterprises through a pattern of racketeering activity, in violation of O.C.G.A. § 16-14-4(c).

366.    The Hyundai Kia Automotive Group, of which Glovis was an affiliate, was one of GFA's largest customers.

367.    Specifically, the predicate acts of racketeering activity by which GFA committed, conspired to commit, and committed overt acts to effect the Georgia RICO violations set forth in the preceding paragraphs, are the following:

    a.    Mail fraud in violation of 18 U.S.C. § 1341;

    b.    Wire fraud in violation of 18 U.S.C. § 1343;

    c.    Fraud in foreign labor contracting in violation of 18 U.S.C. § 1351;

d.    Visa fraud in violation of 18 U.S.C. § 1546; and

e.    False statements and writings, in violation of O.C.G.A. § 16-10-20.

368.    GFA used proceeds derived from the racketeering activity—and conspired to do so—to acquire and maintain interest in money.

369.    Specifically, the predicate acts of racketeering activity by which Glovis committed, conspired to commit, and committed overt acts to effect the Georgia RICO violations set forth in the preceding paragraphs, are the following:

a.    Mail fraud in violation of 18 U.S.C. § 1341;

b.    Wire fraud in violation of 18 U.S.C. § 1343;

c.    Fraud in foreign labor contracting in violation of 18 U.S.C. § 1351; and

d.    Visa fraud in violation of 18 U.S.C. § 1546.

370.    Glovis used proceeds derived from the racketeering activity to acquire and maintain interest in money. Glovis profited from the RICO Enterprises by securing labor that was less expensive and higher skilled and efficient than other workers.

### *Predicate Acts*

### Conduct Defined as "Racketeering"
### Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343

371.    As set forth in the preceding paragraphs, GFA, though the RICO Enterprises, used the mails and wire communications, including communications via telephone, fax, internet, and/or email, on numerous occasions to make false statements and further these fraudulent schemes.

372.    The mail and wire fraud by GFA was committed in conspiracy with and pursuant to the direction of Glovis to secure TN visa workers to fill manual labor positions at the West Point Warehouse.

373.    Glovis knew that GFA was making these misrepresentations to secure TN visa workers to perform low skilled manual labor jobs at the West Point Warehouse.

374.    These willful, knowing, and intentional acts by GFA and Glovis constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

<u>Fraud in Foreign Labor Contracting: 18 U.S.C. § 1351</u>

375.    As set forth in the preceding paragraphs, GFA, through the RICO Enterprises, knowingly and with intent to defraud, recruited, solicited, and hired Plaintiffs and other Class members outside the United States for the purpose of employment in the United States by means of materially false or fraudulent pretenses, representations, or promises regarding the nature of Plaintiffs' and other GFA Class members' work.

376.    Glovis acquired an interest in personal property and increased profits by knowingly and with intent to defraud, recruited, solicited, and hired Plaintiffs and other Class members outside the United States for the purpose of employment in the United States by means of materially false or fraudulent pretenses, representations, or promises regarding the nature of Plaintiffs' and other GFA Class members' work.

377.    Glovis committed predicate acts of racketeering by knowingly and with intent to defraud by causing and requesting GFA to recruit, solicit, and hire Plaintiffs and other TN visa workers outside the United States, for purposes of employment in the United States by means of materially false or fraudulent pretenses, representations or promises regarding that employment.

378.    These willful, knowing, and intentional acts by GFA and Glovis constitute fraud in foreign labor contracting in violation of 18 U.S.C. § 1351.

<u>Visa Fraud: 18 U.S.C. § 1546</u>

379.    As set forth in the preceding paragraphs, GFA, through the RICO Enterprises, (a) knowingly subscribed as true multiple false statements with respect to material facts in the TN visa application materials required by immigration laws and regulations, and (b) knowingly presented the materials to Plaintiffs, other TN visa candidates, and U.S. visa-issuing authorities.

380.    The TN visas would not have been issued to Plaintiffs and others but for the false statements concerning the work to be performed by Plaintiffs and others at GFA's facilities.

381.    The visa fraud committed by GFA was in conspiracy with Glovis to further the scheme to recruit inexpensive highly skilled labor from Mexico.

382.    Glovis committed visa fraud in violation of 81 U.S.C. § 1546 by knowingly accepting and receiving the TN visas of the TN visa workers as authorization to stay or be employed in the United States while knowing that the TN visa was procured by means of false claims and statements, and to have been otherwise procured by fraud or unlawfully obtained.

383.    Glovis knew that the TN visa did not apply to the manual labor positions in which it placed the GFA recruited TN visa workers.

384.    Glovis knew – due to the many TN visa workers that quit and complained that they were not placed in promised positions -- that GFA made false promises that the TN visa workers would work in engineering and technical positions that qualify under the TN visa program.

385.    Glovis is a sophisticated company that is part of an international organization. It knew that the TN visa applied only to skilled professional workers. Glovis knew that the Mexican workers that GFA recruited could not

secure TN visas based on the job positions that Glovis assigned to the TN visa workers that GFA recruited.

386.    Despite the knowledge identified in the previous three paragraphs, Glovis continued for several years to direct GFA to recruit TN visa workers in Mexico, and continued to accept such TN visa workers for unskilled manual labor positions.

387.    Glovis committed predicate acts of racketeering by engaging and requesting GFA to recruit Mexican workers pursuant to the TN visa program when the job positions available at Glovis facilities were manual labor positions that did not qualify for the TN visa program.

388.    These willful, knowing, and intentional acts by GFA and Glovis constitute fraud and misuse of visas, permits, and other documents in violation of 18 U.S.C. § 1546.

<u>Visa Fraud: 18 U.S.C. § 1546</u>

389.    As set forth in the preceding paragraphs, GFA, individually and through the RICO Enterprises, falsified Plaintiffs' and other GFA Class members' wages and in submissions to the Georgia Department of Revenue, knowing the statements to the Georgia Department of Revenue were false.

390.    These knowing and willful acts constitute false statements and writings, in violation of O.C.G.A. § 16-10-20.

391.    Plaintiff Martinez, Plaintiff Soriano, West Point Class members, McDonough Class members were harmed by the predicate acts of GFA and Glovis.

392.    Glovis' participation in the RICO Enterprises, its conspiracy with GFA to fraudulently recruit Mexican workers, its commission of the predicate acts set forth above, and its provision of a market for GFA to place the TN visa workers, caused direct injury to Plaintiff Martinez and McDonough Class members even though they ultimately were placed at a GFA warehouse not operated by Glovis.

*Pattern of Related Racketeering Acts*

393.    GFA and Glovis committed multiple acts of racketeering activity in furtherance of the fraudulent scheme recruit and employ Mexican engineers for non-existent jobs. O.C.G.A. § 16-14-3(4). Such acts included but are not limited to using the mails and wires to submit dozens of fraudulent Support Letters and Offer Letters; committing visa fraud and fraud in labor contracting; hiring many dozens of workers under the TN visa program under fraudulent pretenses; requiring them to work in non-TN visa qualifying positions; placing TN visa workers in positions that did not qualify under the TN visa program; Glovis's continuing to accept GFA recruits for manual labor positions knowing that GFA had committed fraud in recruiting the workers; and requiring TN visa workers to

kick back a portion of their wages, therefore over-reporting Plaintiffs' wages to the Georgia Department of Revenue.

394.    GFA and Glovis committed multiple acts of racketeering activity in furtherance of the fraudulent transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents. *Id.*

### *Injury and Remedies*

395.    As a direct and proximate result of GFA's and Glovis's willful, knowing, and intentional acts discussed in this section, Plaintiffs and GFA Class members have suffered and will suffer injuries to their property, including but not limited to visa processing fees, unreimbursed travel expenses, relocation expenses, housing-related expenses at the employer-provided apartments; purchase of tools required for their jobs; wage underpayments; excess taxes paid, and other pecuniary losses.

396.    Plaintiffs have sustained actual damages, and GFA and Glovis acted with gross fraud, wantonness, maliciousness, and the willful disregard of the rights of others, such that Plaintiff and the GFA Class members are entitled to punitive damages.

397.    Plaintiffs and other GFA Class members are entitled to an award of damages in an amount to be determined at trial, including but not limited to:

      a.     Compensation for their actual damages, punitive damages, and trebling of these damages as authorized by O.C.G.A. § 16-14-6(c);

      b.     Injunctive relief as authorized by O.C.G.A. § 16-14-6(a) and (b).

      c.     Attorney's fees and costs and expert's fees and costs associated with this action as authorized by O.C.G.A. § 16-14-6(c).

**COUNT III**
**Violations of 42 U.S.C. § 1981**
**On behalf of the McDonough Subclass Against GFA**

398.   Plaintiff Martinez and McDonough Subclass members reallege and incorporate all preceding paragraphs as if set forth fully herein.

399.   This Count sets forth claims for damages arising out of the McDonough Subclass members' 42 U.S.C. § 1981 claims against GFA.

400.   Plaintiff Martinez and McDonough Subclass members were parties to contracts, including contracts for the performance of work, in which Plaintiffs and the McDonough Subclass members were compensated by GFA for work.

401.   Plaintiff Martinez and the McDonough Subclass members performed their contractual obligations.

402.   Plaintiff Martinez and the McDonough Subclass members are Hispanic or Latino and of Hispanic or Latino ancestry.

403.   Plaintiff Martinez and the McDonough Subclass members are citizens of Mexico and not citizens of the United States.

404.   To be clear, this claim is not based on Plaintiffs' immigration status.

405.   Section 1981 prohibits employers from taking adverse employment actions because of an employee's protected class. Section 1981 and Title VII discrimination claims are evaluated under the same standard. *King v. Kirkland's Stores, Inc.*, No. 2:04-cv-1055, 2006 WL 2239208, at *7 (M.D. Ala. Aug. 4, 2006). A plaintiff need only show "some harm" in a term or condition of employment; he "does not have to show . . . that the harm incurred was "significant" . . . [o]r serious, or substantial, or any similar adjective[.]" *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024); *see also West v. Butler County Board of Education*, 2024 WL 2697987 (11th Cir., May 24, 2024) (vacating district court's dismissal of Title VII discrimination and remanding in light of new *Muldrow* standard).

406.   The above-pled discriminatory conduct toward Plaintiff Martinez and the McDonough Subclass members constitutes unlawful race discrimination against them in violation of 42 U.S.C. § 1981.

407.   GFA undertook its discriminatory conduct, including but not limited to wage discrimination and other discrimination in the terms and conditions of employment, intentionally and maliciously with respect to Plaintiff Martinez and the McDonough Subclass members and their federally protected rights, or additionally, and in the alternative, undertook their conduct recklessly with respect to Plaintiff Martinez and the McDonough Subclass members and their

federally protected rights, entitling them to recover punitive damages against GFA.

408.    As a direct and proximate result of GFA's unlawful actions, Plaintiff Martinez and the McDonough Subclass members have suffered lost compensation and other benefits of employment, pain and suffering in the form of emotional distress, inconvenience, humiliation, and other indignities.

409.    Plaintiff Martinez and the McDonough Subclass members are entitled to damages, including back pay and lost benefits, promotion or a higher rate of pay, compensatory damages, punitive damages, attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under 42 U.S.C. § 1981.

**COUNT IV**
**Violations of 42 U.S.C. § 1981**
**On behalf of the West Point Subclass Against GFA and Glovis**

410.    Plaintiff Soriano and the West Point Subclass members reallege and incorporate all preceding paragraphs as if set forth fully herein.

411.    This Count sets forth claims for damages arising out of the West Point Subclass members' 42 U.S.C. § 1981 claims against GFA and Glovis.

412.    Plaintiff Soriano and West Point Subclass members were parties to contracts, including contracts for the performance of work, in which Plaintiffs and the West Point Subclass members were compensated by GFA and Glovis for work.

413.    Plaintiff Soriano and the West Point Subclass members performed their contractual obligations and were jointly employed by GFA and Glovis.

414.    Plaintiff Soriano and the West Point Subclass members are Hispanic or Latino and of Hispanic or Latino ancestry.

415.    Plaintiff Soriano and the West Point Subclass members are citizens of Mexico and not citizens of the United States.

416.    To be clear, this claim is not based on Plaintiffs' immigration status.

417.    Plaintiff Soriano and the West Point Subclass members were subjected to disparate treatment and discrimination on the basis of their non-white Hispanic or Latino race and on their alienage by, among other things, being paid less for performing the same work as non-Hispanic/non-Latino and American employees of GFA and Glovis, and being forced to work overtime and more hours per week than those non-Hispanic and non-U.S. citizen employees.

418.    Section 1981 prohibits employers from taking adverse employment actions because of an employee's membership in a protected class. Section 1981 and Title VII discrimination claims are evaluated under the same standard. *King v. Kirkland's Stores, Inc.*, No. 2:04-cv-1055, 2006 WL 2239208, at *7 (M.D. Ala. Aug. 4, 2006). A plaintiff need only show "some harm" in a term or condition of employment; she "does not have to show . . . that the harm incurred was "significant" . . . [o]r serious, or substantial, or any similar adjective[.]" *Muldrow v.*

*City of St. Louis*, 144 S. Ct. 967, 974 (2024); *see also West v. Butler County Board of Education*, 2024 WL 2697987 (11th Cir., May 24, 2024) (vacating district court's dismissal of Title VII discrimination and remanding in light of new *Muldrow* standard).

419.    The above-pled discriminatory conduct toward Plaintiff Soriano and the West Point Subclass members constitutes unlawful race discrimination against them in violation of 42 U.S.C. § 1981.

420.    GFA and Glovis undertook their discriminatory conduct, including discrimination relating to wages and other discriminatory terms and conditions of employment, intentionally and maliciously with respect to Plaintiff Soriano and the West Point Subclass members and their federally protected rights, or additionally, and in the alternative, undertook their conduct recklessly with respect to Plaintiff Soriano and the West Point Subclass members and their federally protected rights, entitling them to recover punitive damages against GFA and Glovis.

421.    As a direct and proximate result of GFA's and Glovis's unlawful actions, Plaintiff Soriano and the West Point Subclass members have suffered lost compensation and other benefits of employment, pain and suffering in the form of emotional distress, inconvenience, humiliation, and other indignities.

422.    Plaintiff Soriano and the West Point Subclass members are entitled to damages, including back pay and lost benefits, promotion or a higher rate of pay, compensatory damages, punitive damages, attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable against GFA and Glovis under 42 U.S.C. § 1981.

**COUNT V**
**Violations of Title VII—Discrimination on the Basis of Race and National Origin**
**On behalf of McDonough Subclass against GFA**

423.    Plaintiff Martinez and the McDonough Subclass members reallege and incorporate by reference the foregoing allegations as if set forth fully here.

424.    This Count sets forth Plaintiff Martinez's and the McDonough Subclass members' claims for damages for GFA's violations of 42 U.S.C. § 2000e–2.

425.    Plaintiff Martinez and the McDonough Subclass members are members of a protected class on the basis of race and national origin. They are Mexican citizens born and raised in Mexico, and their race is Latino/Hispanic.

426.    Plaintiff Martinez and the McDonough Subclass members were at all times relevant to this Complaint employed by GFA.

427.    GFA discriminated against Plaintiff Martinez and the McDonough Subclass members on the basis of their non-white Hispanic or Latino race and their Mexican national origin as described above, including but not limited to harassing

them; subjecting them to a hostile work environment; forcing them to work overtime and more hours per week than American and non-Latino employees of GFA; and paying them less for performing the same work as American and non-Latino employees of GFA.

428.   GFA's discrimination against Plaintiff Martinez was severe and pervasive and was evident and in practice by GFA every day of Plaintiff Martinez's and the McDonough Subclass members employment.

429.   Title VII prohibits employers from taking adverse employment actions because of an employee's protected class. A plaintiff need only show "some harm" in a term or condition of employment; he "does not have to show . . . that the harm incurred was "significant" . . . [o]r serious, or substantial, or any similar adjective[.]" *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024); *see also West v. Butler County Board of Education*, 2024 WL 2697987 (11th Cir., May 24, 2024) (vacating district court's dismissal of Title VII discrimination and remanding in light of new *Muldrow* standard).

430.   The above-pled discriminatory conduct toward Plaintiff Martinez and the McDonough Subclass members constitutes unlawful race and national origin discrimination against them in violation of 42 U.S.C. § 2000e–2.

431.   GFA undertook its discriminatory conduct intentionally and maliciously with respect Plaintiff Martinez and the McDonough Subclass

members and their federally protected rights, or additionally, and in the alternative, undertook their conduct recklessly, entitling Plaintiff Martinez and the McDonough Subclass members to recover punitive damages against Defendants.

432.    As a direct and proximate result of these unlawful employment practices and in disregard of Plaintiff Martinez and the McDonough Subclass members' rights and sensibilities, they have suffered humiliation, degradation, emotional distress, other consequential damages, and lost wages.

433.    Plaintiff Martinez and the McDonough Subclass members are entitled to damages, including back pay and lost benefits, promotion or a higher rate of pay, compensatory damages, punitive damages, attorney's fees and costs of litigation pursuant to 42 U.S.C. § 2000e–2.

## COUNT VI
### Violations of Title VII—Discrimination on the Basis of Race and National Origin
### On behalf of the West Point Subclass against GFA and Glovis

434.    Plaintiff Soriano and the West Point Subclass members reallege and incorporate by reference the foregoing allegations as if set forth fully here.

435.    This Count sets forth Plaintiff Soriano's and the West Point Subclass members' claims for damages from GFA's and Glovis's violations of 42 U.S.C. § 2000e–2.

436.    Plaintiff Soriano and the West Point Subclass members are members of a protected class on the basis of race and national origin. They are Mexican citizens born and raised in Mexico, and their race is Latino/Hispanic.

437.    Plaintiff Soriano and the West Point Subclass members were jointly employed by GFA and Glovis.

438.    GFA and Glovis discriminated against Plaintiff Soriano and the West Point Subclass members on the basis of their non-white Hispanic or Latino race and their Mexican national origin as described above, including but not limited to harassing them, subjecting them to a hostile work environment, and paying them less for performing the same work as American and non-Latino employees of GFA and Glovis.

439.    GFA's and Glovis' discrimination against Plaintiff Soriano and the West Point Subclass members was severe and pervasive and was evident and in practice by GFA every day of Plaintiff Soriano's and the West Point Subclass members employment.

440.    Title VII prohibits employers from taking adverse employment actions because of an employee's membership in a protected class. A plaintiff need only show "some harm" in a term or condition of employment; she "does not have to show . . . that the harm incurred was "significant" . . . [o]r serious, or substantial, or any similar adjective[.]" *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024);

*see also West v. Butler County Board of Education*, 2024 WL 2697987 (11th Cir., May 24, 2024) (vacating district court's dismissal of Title VII discrimination and remanding in light of new *Muldrow* standard).

441.    The above-pled discriminatory conduct toward Plaintiff Soriano and the West Point Subclass members constitutes unlawful race and national origin discrimination against them in violation of 42 U.S.C. § 2000e–2.

442.    GFA and Glovis undertook their discriminatory conduct intentionally and maliciously with respect to Plaintiff Soriano and the West Point Subclass members and their federally protected rights, or additionally, and in the alternative, undertook their conduct recklessly, entitling Plaintiff Soriano and the West Point Subclass members to recover punitive damages against Defendants.

443.    As a direct and proximate result of these unlawful employment practices and in disregard of Plaintiff Soriano and the West Point Subclass members' rights and sensibilities, they have suffered humiliation, degradation, emotional distress, other consequential damages, and lost wages.

444.    Plaintiff Soriano and the West Point Subclass members are entitled to damages, including back pay and lost benefits, promotion or a higher rate of pay, compensatory damages, punitive damages, attorney's fees and costs of litigation pursuant to 42 U.S.C. § 2000e–2.

## COUNT VII
### Filing False Information Returns

**On behalf of the GFA Class against GFA**

445.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

446.    This Count sets forth claims by Plaintiffs and other GFA Class members against GFA for damages and statutory penalties resulting from GFA's violations of 26 U.S.C. § 7434 (filing false information returns).

447.    As set forth above, GFA provided the IRS false information regarding Plaintiffs' and other GFA Class members' Social Security wages on Defendants' quarterly and annual information returns, including on W-2 Forms, in an attempt to defraud the IRS.

448.    Plaintiffs and other GFA Class members therefore are entitled, under 26 U.S.C. §7434(b), to recover the greater of either $5,000.00 for each false information return or damages Plaintiffs and other GFA Class members sustained, the costs of this action, and reasonable attorney's fees.

449.    As required by 26 U.S.C. § 7434(d), Plaintiffs will provide a copy of this Complaint to the Internal Revenue Service.

**COUNT VIII**
**Violations of Title VII—Pregnancy Discrimination (Pregnancy Discrimination Act, Title VII, 42 U.S.C. §§ 2000e, et. Seq.)**
**Individual Claim**
**Plaintiff Soriano against GFA and Glovis**

450.    Plaintiff Soriano realleges and incorporates by reference the foregoing allegations as if set forth fully here.

451.    Title VII prohibits employers from discriminating against an employee on the basis of sex.

452.    The Pregnancy Discrimination Act ("PDA"), part of Title VII, forbids discrimination based on pregnancy in any aspect of employment, including hiring, firing, pay, job assignments, promotions, layoff, training, fringe benefits, and any other term or condition of employment.

453.    An employer's refusal to provide pregnancy-related accommodations while providing accommodations to other employees who are similar in their ability or inability to work constitutes sex discrimination in violation of Title VII.

454.    Discrimination because of pregnancy and because of pregnancy-related conditions constitutes sex discrimination because pregnancy is a sex-based characteristic.

455.    In perpetrating the above-described acts and omissions, Defendants, their agents, servants, and employees, engaged in unlawful pregnancy discrimination in violation of the PDA.

456.    Plaintiff Soriano is a member of a protected class on the basis of sex. She is a woman. And from the end of 2022 through September 2, 2023, she was pregnant.

457.    GFA and Glovis discriminated against Plaintiff Soriano on the basis of her sex and her pregnancy by failing to offer her an accommodation.

458.    Plaintiff Soriano made repeated requests for accommodation to GFA management.

459.    Even though GFA accommodated the requests of similarly abled non-pregnant workers to move to lighter work, it denied Plaintiff Soriano's requests for accommodation.

460.    Instead, GFA responded to Plaintiff Soriano's requests for accommodation by holding her to higher standards than her less qualified but non-pregnant colleagues, disciplining her and eventually firing her.

461.    Because of GFA and Glovis's fraudulent use of the TN visa, Plaintiff Soriano—an Industrial Chemist with engineering experience—was overqualified for her position performing manual labor on the line for GFA and Glovis.

462.    GFA and Glovis discriminated against Plaintiff Soriano as described above, including but not limited to harassing her, subjecting her to a hostile work environment, differently applying employment and disciplinary policies to her, and firing her because of her pregnancy and her requests for accommodation.

463.    GFA's and Glovis's discrimination against Plaintiff Soriano was intentional, severe, and pervasive.

99

464.    Plaintiff Soriano was harmed as a result of the above-described conduct of Defendants, which was a substantial factor in causing Plaintiff Soriano harm.

465.    As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff Soriano's rights and sensibilities, Plaintiff Soriano has suffered general damages including, but not limited to, lost wages, pain, suffering, humiliation, shame, anxiety, embarrassment, mortification, hurt feelings, physical harm, and emotional distress, all in an amount to be proven at trial.

466.    Plaintiff Soriano is entitled to statutory attorneys' fees and costs, and other appropriate relief as determined by this Court.

**COUNT IX**
**Retaliation (Pregnancy Discrimination Act, Title VII, 42 U.S.C. §§ 2000e, et seq.)**
**Individual Claim**
**Plaintiff Soriano against GFA and Glovis**

467.    Plaintiff Soriano incorporates by reference each and every allegation contained in the preceding paragraphs as though fully stated here.

468.    Title VII prohibits employers from retaliating against an employee because she engaged in a protected activity. Complaining of pregnancy harassment or discrimination is a protected activity under Title VII.

469.    GFA and Glovis and their agents, servants, and employees, engaged in unlawful retaliation in violation of Title VII.

470.    Plaintiff Soriano engaged in protected activity consisting of, among other things:

      a.    Requesting lighter duty as an accommodation for her pregnancy-related condition, which caused her unexpected vaginal bleeding;

      b.    Requesting pregnancy accommodations; and

      c.    Opposing Defendants' retaliatory discipline of her by lodging informal complaints and refusing to sign a pretextual write-up.

471.    Defendants, its agents, and employees retaliated against Plaintiff Soriano on the basis of her protected activities and took material and adverse employment actions against her, including creating and permitting a hostile work environment, telling Plaintiff Soriano's colleagues that no one should help the workers like her who labored in the same heavy work area, issuing pretextual disciplinary measures against her, calling the police to forcibly remove her from the workplace, and firing her.

472.    Plaintiff Soriano was harmed as a direct and proximate result of the above-described conduct of GFA and Glovis, which was severe and pervasive and was a substantial factor in causing Plaintiff Soriano's harm.

473.   As a direct and legal result of the above-described conduct of GFA and Glovis, Plaintiff Soriano has and will continue to suffer general damages including, but not limited to, lost wages, pain, suffering, humiliation, shame, anxiety, embarrassment, mortification, hurt feelings, physical harm, and emotional distress, in excess of the jurisdictional limits of this Court, all in an amount to be proven at trial.

474.   Plaintiff Soriano is entitled to statutory attorneys' fees and costs, and other appropriate relief as determined by this Court.

**COUNT X**
**Actual and "Regarded As" Disability Discrimination, Failure to Provide**
**Reasonable Accommodation for Disability, and Unlawful Interference in**
**Violation of the Americans with Disabilities Act (42 U.S.C. §§ 12112(a);**
**12112(b)(5)(A); 42 U.S.C. § 12203(b))**
**Individual Claim**
**Plaintiff Soriano against GFA and Glovis**

475.   Plaintiff Soriano realleges and incorporates by reference the foregoing allegations as if set forth fully here.

476.   The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Disability includes "a physical . . . impairment that substantially limits one or more major

life activities . . . "42 U.S.C. § 12102(1)(A), 29 C.F.R. § 1603.2(g)(1)(i), and "being regarded as having such an impairment . . . " 42 U.S.C. § 12102 (1)(C).

477.   A physical or mental impairment is "any physiological disorder or condition [that affects] . . . one or more body systems, such as musculoskeletal . . . reproductive, digestive, genitourinary, immune, [and] circulatory . . . " 29 C.F.R. § 1630.2(h)(1). A disability is substantially limiting if it limits the "ability of an individual to perform a major life activity as compared to most in the general population." 29 C.F.R. § 1603.2(j)(ii). Major life activities include but are not limited to (i) "caring for oneself, performing manual tasks . . . walking, standing, sitting, reaching, lifting . . . and working and (ii) the operation of a major bodily function." 29 C.F.R. § 1603 .2(i)(1)(i)-(ii).

478.   While pregnancy itself is not a disability, some pregnancy-related conditions do qualify as disabilities. *See* EEOC Enforcement Guidance: Pregnancy Discrimination and Related Issues, Number 915.003, footnote 149,7114114, Section ILA. ("[U]nder the amended ADA, it is likely that a number of pregnancy-related impairments that impose work-related restrictions will be substantially limiting, even though they are only temporary. Some impairments of the reproductive system may make a pregnancy more difficult and thus necessitate certain physical restrictions to enable a full term pregnancy, or may result in limitations following childbirth.").

479.   Plaintiff Soriano was a "qualified individual with a disability" as that term is defined by the ADA. 42 U.S.C. § 12111(8). She had an impairment that substantially limited a major life activity (lifting). For most of her pregnancy, Plaintiff Soriano was unable to lift more than 25 pounds.

480.   At all times relevant, Plaintiff Soriano was, with reasonable accommodation, able to perform the essential functions of her then-current position as a picker. She was also able to perform, even without accommodation, the essential functions of the lighter duty position she had initially been assigned to. She was also able to perform the essential functions of the Industrial Engineer role that she had originally been offered, and that she was hired to perform.

481.   GFA and Glovis regarded Plaintiff Soriano as having a disability within the meaning of the ADA.

482.   Employers have an affirmative duty under the ADA to make "reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability . . . . " 42 U.S.C. § 12112(b)(5)(A). "To determine the appropriate reasonable accommodation, it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(0)(3); *see also* 29 C.F.R. pt. 1630, app., at § 1630.9.

483.    The ADA prohibits "any person" from 'interfer[ing] with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b).

484.    Plaintiff Soriano requested a reasonable accommodation for her disability (a) in January 2023 by repeatedly asking GFA and Glovis for light duty; and (b) in February 2023 when she requested to continue working with the lifting restriction advised by her doctor.

485.    GFA and Glovis refused to accommodate Plaintiff Soriano and failed to engage in a good-faith interactive process with her to identify and implement her requested accommodation.

486.    Instead, GFA and Glovis denied her request for accommodation, issued pretextual disciplinary write-ups, called the police to remove her from the workplace, terminated her employment and failed to reinstate and rehire Plaintiff Soriano.

487.    GFA and Glovis failed to comply with their obligation to provide Plaintiff Soriano with the reasonable accommodation required under 42 U.S.C. § 12112(b)(5)(A) and unlawfully discriminated against Plaintiff Soriano because of her actual and perceived disability.

488.    GFA and Glovis unlawfully interfered with Plaintiff Soriano's right to reasonable accommodation based on her disability, in violation of 42 U.S.C. § 12203(b).

489.    As a direct and proximate result of this discrimination based on Plaintiff Soriano's actual and perceived disability, Plaintiff Soriano has sustained a loss of earnings and other benefits. Plaintiff Soriano has also suffered emotional distress manifested by feelings of anxiety, nervousness, embarrassment and other symptoms of stress.

490.    GFA's and Glovis's unlawful acts were performed with malice, oppression and fraud, in that they had the power to accommodate Plaintiff Soriano, but instead terminated her employment immediately after Plaintiff's first prenatal appointment and called the police to embarrass Plaintiff and to forcibly remove Plaintiff from the premises, out of an intentional and malicious desire to avoid their legal responsibility to reinstate and/or rehire individuals with disabilities and/or to not discriminate based on perceived disabilities, warranting an award of punitive damages.

491.    As a direct and proximate result of the acts and omissions of GFA and Glovis, Plaintiff Soriano is entitled to injunctive relief, reinstatement, lost wages, punitive damages, emotional distress damages, attorneys' fees, and other benefits in an amount to be proven at trial.

## COUNT XI
### Retaliation, Title VII, 42 U.S.C. §§ 2000e-3
### Individual Claim
### Plaintiff Martinez against GFA

492.    Plaintiff Martinez realleges and incorporates by reference the foregoing allegations as if set forth fully here.

493.    Title VII prohibits employers from retaliating against any employee who "has opposed any practice made an unlawful employment practice by this subchapter, or because [such employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

494.    Plaintiff Martinez engaged in statutorily protected activity when he opposed GFA's discrimination.

495.    Because of Plaintiff Martinez's statutorily protected activity, GFA retaliated against Plaintiff Martinez.

496.    GFA has therefore violated Title VII's prohibition on retaliation and is liable to Plaintiff Martinez for all damages caused by GFA's above-described violations, including lost wages, other compensatory damages including but not limited to pain and suffering, attorneys' fees, and other costs of this litigation.

## COUNT XII
### Fair Labor Standards Act Minimum Wage and Overtime Violations
### Collective Action Claim
### On behalf of the McDonough FLSA Subclass against GFA

497.    Plaintiff Martinez realleges and incorporates by reference the foregoing allegations as if set forth fully here.

498.    Plaintiff Martinez consents in writing to become a party plaintiff in this action for claims under the FLSA. (Doc. 1-1).

499.    This count sets forth a claim by Plaintiff Martinez, and a collective class of the same persons in the McDonough FLSA Subclass.

500.    GFA failed to reimburse Plaintiff Martinez's and the McDonough FLSA Subclass's cost of their TN visas and inbound and outbound travel expenses, which primarily benefitted Defendants, in their first and final workweeks, thereby violating the minimum wage provision of the FLSA, 29 U.S.C. § 206(a), and the overtime provision of the FLSA, 29 U.S.C. § 207(a).

501.    Under Section 203(m) of the FLSA, an employer may, under certain circumstances, credit or withhold employees' wages for the reasonable cost to the employer of furnishing employees with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by an employer to its employees, without running afoul of the FLSA's minimum wage and overtime requirements. 29 U.S.C. § 203(m).

502.    However, under § 203(m), an employer may only deduct housing costs from employees that are the reasonable cost of housing, and may not deduct

more than the actual cost to the employer of the housing or make a profit for the employer. 29 U.S.C. § 203(m); 29 C.F.R. § 531.3 et seq.

503.    The cost of furnishing facilities to employees that is primarily for the benefit or convenience the employer is not reasonable. 29 C.F.R. § 531.3 et seq.

504.    In addition, an employer may only deduct housing costs from employees if the credit is voluntary and un-coerced. 29 U.S.C. § 203(m); 29 C.F.R. § 531.30.

505.    An employer must also maintain accurate records of the costs incurred in furnishing lodging for employees. 29 C.F.R. § 516.27(a).

506.    Here, during the course of their employment with Defendants, Plaintiff Martinez and the McDonough FLSA Subclass had to pay $100.00 per week for housing in McDonough, Georgia, and limited use of a company vehicle.

507.    The housing and transportation fees Defendants charged Plaintiff Martinez and the McDonough FLSA Subclass were unreasonable, and were more than the actual cost to Defendants of the housing and transportation.

508.    The housing and transportation fees charged to Plaintiff Martinez and the McDonough FLSA Subclass were for the benefit and convenience of GFA.

509.    Upon information and belief, GFA garnered profits from the housing and transportation fees charged to Plaintiff Martinez and the McDonough FLSA Subclass. In addition, the housing and transportation fees charged to Plaintiffs and

those similarly situated were not voluntary or un-coerced. Rather, they were mandatory and compelled.

510.   Plaintiff Martinez and the McDonough FLSA Subclass were required to live in the employer-provided housing in McDonough, Georgia, and GFA deducted the housing and transportation fees off-the-books from their pay.

511.   Plaintiff Martinez and the McDonough FLSA Subclass regularly worked more than 40 hours in a single work week.

512.   GFA failed to pay one-and-one-half times Plaintiff Martinez's and the McDonough FLSA Subclass's regular rate of pay for hours above 40 in a work week, thereby violating the overtime provisions of the FLSA, 29 U.S.C. § 207(a), and its implementing regulations.

513.   GFA's violations of the FLSA were willful in that they were aware of their obligations regarding overtime and minimum wages, showed reckless disregard for whether their conduct violated the FLSA, or acted without a reasonable basis to believe their actions were in compliance with the FLSA.

514.   Plaintiff Martinez and the McDonough Subclass members are entitled to their unpaid wages, plus an additional equal amount in liquidated damages, as a consequence of GFA's unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

515.   Plaintiff Martinez and the McDonough Subclass members are also entitled to costs of court, pursuant to 29 U.S.C. § 216(b).

516.   Plaintiff Martinez and the McDonough Subclass members also seek, and are entitled to, the attorneys' fees incurred by their counsel, pursuant to 29 U.S.C. § 216(b).

**COUNT XIII**
**Fair Labor Standards Act Violations**
**Collective Action Claim**
**On behalf of the West Point FLSA Subclass against GFA and Glovis**

517.   Plaintiff Soriano realleges and incorporates by reference the foregoing allegations as if set forth fully here.

518.   Plaintiff Soriano consents in writing to become a party plaintiff in this action for claims under the FLSA. (Doc. 1-2).

519.   This count sets forth a claim by Plaintiff Soriano, and a collective class of the same persons in the West Point FLSA Subclass.

520.   GFA and Glovis failed to reimburse Plaintiff Soriano's and the West Point FLSA Subclass's cost of their TN visas and inbound and outbound travel expenses, which primarily benefitted Defendants, in their first and final workweeks, thereby violating the minimum wage provision of the FLSA, 29 U.S.C. § 206(a), and the overtime provision of the FLSA, 29 U.S.C. § 207(a).

521.    Under Section 203(m) of the FLSA, an employer may, under certain circumstances, credit or withhold employees' wages for the reasonable cost to the employer of furnishing employees with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by an employer to its employees, without running afoul of the FLSA's minimum wage and overtime requirements. 29 U.S.C. § 203(m).

522.    However, under § 203(m), an employer may only deduct housing costs from employees that are the reasonable cost of housing, and not deduct more than the actual cost to the employer of the housing or make a profit for the employer. 29 U.S.C. § 203(m); 29 C.F.R. § 531.3 et seq.

523.    The cost of furnishing facilities to employees that is primarily for the benefit or convenience the employer is not reasonable. 29 C.F.R. § 531.3 et seq.

524.    In addition, an employer may only deduct housing costs from employees if the credit is voluntary and un-coerced. 29 U.S.C. § 203(m); 29 C.F.R. § 531.30.

525.    Further, an employer cannot deduct from employees for housing that is substandard. 29 U.S.C. § 203(m); 29 C.F.R. § 531.31.

526.    An employer must also maintain accurate records of the costs incurred in furnishing lodging for employees. 29 C.F.R. § 516.27(a).

527.    Here, during the course of their employment with Defendants, Plaintiff Soriano and members of the West Point FLSA Subclass were required to pay $110.00 per week for housing in Valley, Alabama and limited use of a company vehicle.

528.    The housing and transportation fees Defendants charged Plaintiff Soriano and the West Point FLSA Subclass were unreasonable, and were more than the actual cost to Defendants of the housing and transportation.

529.    The housing and transportation fees charged to Plaintiff Soriano and the West Point FLSA Subclass were for the benefit and convenience of GFA and Glovis.

530.    Upon information and belief, GFA garnered profits from the housing and transportation fees charged to Plaintiff Soriano and the West Point FLSA Subclass. In addition, the housing and transportation fees charged to Plaintiff Soriano and the West Point FLSA Subclass were not voluntary or un-coerced. Rather, they were mandatory and compelled.

531.    Plaintiff Soriano and the West Point FLSA Subclass were required to live in the employer-provided housing in Valley, Alabama, and GFA and Glovis deducted the housing and transportation fees off-the-books from their pay.

532.    Plaintiff Soriano and the West Point FLSA Subclass regularly worked more than 40 hours in a single work week.

533.    GFA and Glovis failed to pay one-and-one-half times Plaintiff Soriano's and the West Point FLSA Subclass's regular rate of pay for hours above 40 in a work week violated the overtime provisions of the FLSA, 29 U.S.C. § 207(a), and its implementing regulations.

534.    GFA's and Glovis's violations of the FLSA were willful in that they were aware of their obligations regarding overtime and minimum wages, showed reckless disregard for whether their conduct violated the FLSA, or acted without a reasonable basis to believe their actions were in compliance with the FLSA.

535.    Plaintiff Soriano and the West Point FLSA Subclass members are entitled to their unpaid wages, plus an additional equal amount in liquidated damages, as a consequence of GFA's unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

536.    Plaintiff Soriano and the West Point FLSA Subclass members are also entitled to costs of court, pursuant to 29 U.S.C. § 216(b).

537.    Plaintiff Soriano and the West Point FLSA Subclass members also seek, and are entitled to, the attorneys' fees incurred by their counsel, pursuant to 29 U.S.C. § 216(b).

**COUNT XIV**
**Retaliation, Fair Labor Standards Act, 29 U.S.C. § 215(a)(3)**
**Individual Claim**
**Plaintiff Martinez against GFA**

538.    Plaintiff Martinez realleges and incorporates by reference the foregoing allegations as if set forth fully here.

539.    This count sets forth a claim by Plaintiff Martinez for damages resulting from GFA's violations of the FLSA protections against retaliation, 29 U.S.C. § 215(a)(3).

540.    Plaintiff Martinez engaged in statutorily protected conduct when he complained to GFA's management that he was not paid proper overtime wages under the FLSA.

541.    GFA retaliated against Plaintiff Martinez relating to the conditions of his employment for engaging in this protected conduct.

542.    Plaintiff Martinez is entitled to compensatory damages, plus an additional equal amount in liquidated damages, as a consequence of Defendant's unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

543.    Plaintiff Martinez is also entitled to costs of Court, pursuant to 29 U.S.C. § 216(b).

544.    Plaintiff Martinez also seeks, and is entitled to, the attorneys' fees incurred by his counsel, pursuant to 29 U.S.C. § 216(b).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, demand a trial by jury on all triable issues and seeks judgment as follows:

a.      certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as counsel for the Class and Subclasses;

b.      certifying this case as a FLSA collective action pursuant to 29 U.S.C. § 216, allowing Plaintiffs to provide notice of this action to potential opt-in plaintiffs, and allowing those eligible TN visa holders who choose to do so to opt into this action;

c.      granting judgment to Plaintiffs Martinez and Soriano, GFA Class members, McDonough Subclass members, and West Point Subclass members against GFA, on claims for breach of contract, violation of Georgia RICO, Title VII discrimination, Section 1981 discrimination, and awarding them all compensatory damages, liquidated damages, treble damages, punitive damages, attorneys' fees and costs;

d.      granting judgment to Plaintiff Martinez, Plaintiff Soriano and the GFA Class members against Glovis for violation of Georgia RICO and awarding them all compensatory damages, liquidated damages, treble damages, punitive damages, attorneys' fees and costs;

e.      granting judgment to Plaintiff Soriano and the West Point Class members against Glovis for Title VII discrimination, Section 1981 discrimination, and awarding them all compensatory damages, liquidated damages, treble damages, punitive damages, attorneys' fees and costs;

f.      granting judgment to Plaintiffs and the GFA Class members against GFA on claims for filing false information returns, and awarding them the greater of either $5,000.00 for each false information return or damages Plaintiffs and other GFA Class members sustained;

g.      granting judgment and awarding compensatory and punitive damages as a consequence of Plaintiff Soriano's pregnancy discrimination, disability discrimination, and pregnancy and disability retaliation claims in an amount to be proven at trial;

h.      granting judgment and awarding compensatory and punitive damages as a consequence of Plaintiff Martinez's Title VII retaliation claims in an amount to be proven at trial;

i.      granting judgment against GFA and Glovis to Plaintiffs and other similarly situated TN visa holders who opt in pursuant to 29 U.S.C. § 216(b) on their FLSA claims, and awarding each of them their unpaid wages plus an equal amount in liquidated damages, attorneys' fees and costs;

j.      granting judgment and awarding compensatory and

liquidated damages as a consequence of Plaintiff Martinez's FLSA

retaliation claims in an amount to be proven at trial;

k.      awarding Plaintiffs and other Class members prejudgment

and post-judgment interest as allowed by law;

l.      awarding Plaintiffs and other Class members their costs and

reasonable attorneys' fees; and

m.      granting such further relief as the Court finds just.


## JURY DEMAND

Plaintiffs, individually and on behalf of the Class, hereby demand a trial

by jury as to all issues so triable.

Respectfully submitted this day: October 18, 2024.


Brian J. Sutherland                          Daniel Werner
Georgia Bar No. 105408                       Georgia Bar No. 422070
brian@beal.law                               dwerner@radfordscott.com
Rachel Berlin Benjamin                       James Radford
Georgia Bar No. 707419                       Georgia Bar No. 108007
rachel@beal.law                              jradford@radfordscott.com
BEAL, SUTHERLAND,                            RADFORD SCOTT LLP
BERLIN & BROWN, LLC                          125 Clairemont Ave, Suite 380
2200 Century Parkway NE                      Decatur, GA 30030
Suite 100                                    Tel: (678) 271-0300
Atlanta, GA 30345
Tel: (678) 439-0330

_/s/Christopher B. Hall_____
Christopher B. Hall
Georgia Bar No. 318380
HALL & LAMPROS, LLP
300 Galleria Parkway, Suite 300
Atlanta, GA 30339
Telephone: (404) 876-8100
chall@hallandlampros.com

Abigail R. Kerfoot*
California Bar No. 335970
abigail@cdmigrante.org
Henna Kaushal*
California Bar No. 336673
henna@cdmigrante.org
CENTRO DE LOS DERECHOS
DEL MIGRANTE, INC.
711 W. 40th Street, Suite 412
Baltimore, MD 21211
Tel: (855) 234-9699
* Admitted _Pro Hac Vice_

## CERTIFICATION OF COMPLIANCE

Pursuant to Local Rule 7.1D, counsel certifies that this filing was prepared using Book Antiqua 13-point font.

_/s/ Daniel Werner_____